LUCKING v. DELANO, Comptroller of the Currency.

No. 7628.

United States Court of Appeals for the District of Columbia.

May 19, 1941.

Decided May 19, 1941.

Albert W. Fox, of Washington, D. C., and William Lucking, of Detroit, Mich., for appellant.

George P. Barse, of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

MILLER, Associate Justice.

William Alfred Lucking, who was plaintiff in the District Court and is appellant here, was a depositor in the First National Bank-Detroit at the time it closed in February, 1933. The bank was closed by the Comptroller of the Currency because it was insolvent within the meaning of the federal statutes. Appellant filed his complaint in the lower court as a class suit on behalf of all general depositors and credi-

tors of the bank, namely, those who had, at the date of the filing of suit, received 80% of their deposits in the bank. Suit was brought against both the Comptroller of the Currency and the Receiver of the First National Bank-Detroit. Return of service upon Schram, the Receiver, indicated that service was made upon David Pine, United States Attorney for the District of Columbia. The lower court granted the motion of appellee Delano to dismiss the amended and supplemental bills of complaint, as well as his motion to quash the subpoena duces tecum; it sustained his objections to answering interrogatories filed by appellant, and granted the motion, under special appearance of appellee Schram, to quash attempted service of process upon him. The court also denied appellant's motion for a new trial.

Upon this appeal, appellant urges that the lower court failed to make findings of fact. As appellee points out, this contention is raised for the first time in this court. It was not called to the attention of the trial court; was not included in the motion for new trial; and was not included in appellant's points on appeal. But even apart from appellant's failure thus to present a reviewable question for our determination,[1] it is obvious that the trial court was not required to make findings. The motion to dismiss admitted, for the purposes of the motion, all facts well pleaded.[2] Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, has no application to the present case as that rule relates to actions tried upon the facts without a jury. This case was not tried upon the facts, but was decided upon questions of law arising upon the motion to dismiss.

The relief sought by appellant in the lower court may be summarized as follows: (1) An accounting for excessive expenses paid to the Receiver's attorneys and for salaries paid by the Comptroller's office; (2) mandatory writs of injunction to compel recovery of unlawful payments made by the Receiver; and to prevent further payments for such purposes; (3) a determination that the Receiver has sufficient assets to pay all lawful claims in full; (4) that the court wind up the affairs of the receivership; (5) that the court appoint

1 Cf. Massachusetts Bonding & Ins. Co. v. Preferred Automobile Ins. Co.; 6 Cir., 110 F.2d 764; Drybrough v. Ware, 6 Cir., 111 F.2d 548, 550.

2 Thomas v. Peyser, 73 App.D.C. 155, 118 F.2d 869.

a committee of eleven to formulate and present to the court a liquidation plan (as agreed upon by appellant and the Comptroller); the committee fairly to represent the interests of depositors and stockholders of the bank and to be given all necessary information from the books and records of the Receiver; (6) that the court restrain any special group or interest among the stockholders or depositors of the bank from interfering in any manner with the work of the committee of eleven, and require any and all such groups to present any plan or ideas which they may have for termination of the receivership to the committee or to the court by a verified petition for leave to be heard in the present cause; (7) that appellees be required to answer interrogatories; (8) for general relief. In his "Amendments to Complaint" filed on July 24, 1939, appellant set out the legislative history of an act which he alleged was passed by the Michigan Legislature, limiting the payment of interest upon deposits in closed banks; that the Governor of Michigan vetoed the bill; *upon information* "that said veto of said House Enrolled Act No. 151 of the Legislature of Michigan at its session in the Spring of 1939, was obtained from the Governor of Michigan, Luren S. Dickinson, by actual misrepresentations and misstatements of facts and by falsely frightening him with a letter prepared by one of the Departments of the State of Michigan at the request of certain large commercial depositors in said First National Bank-Detroit." and, as additional relief, requested: "That this Court permit the addition as parties defendant herein of the said commercial depositors so procuring the said veto of said House Enrolled Act 151, and decree said depositors estopped to claim any interest on their said deposits after the closing of said bank, and that they pay personally all damages resulting by their said acts to all other parties interested in said Bank, either as savings depositors or stockholders therein." In reply to these pleadings and their comprehensive—not to say remarkable—proposals, the Comptroller moved to dismiss for reasons which may be summarized as follows: (1) The complaint as amended and supplemented asks for relief concerning matters which are exclusively within the discretion of the Comptroller; (2) no facts are alleged which would justify the court in setting aside the official acts of the Comptroller; (3) the question whether the Comptroller should approve a plan to terminate the receivership is one which calls for the exercise of discretion by the Comptroller; (4) no sufficient showing appears from the allegations of the complaint to call for an accounting by the Comptroller; (5) the depositors have not yet received payment of their claims in full; (6) no allegations of the complaint show that the Comptroller, or his predecessor, have been guilty of bad faith or personal fraud in the administration of the receivership.

In our view the correctness of the reasons assigned by the Comptroller is apparent, and the lower court properly granted the motion to dismiss. Appellant argues generally that in a number of cases various acts of the Comptroller and Receiver have been fully examined by the courts and decided on the merits. It is sufficient to say of the present case that, unlike the cases cited, the pleadings did not contain allegations sufficient to require consideration upon the merits. In this connection appellant's reliance upon Cooper v. Woodin[3] provides a good example. In that case a reorganization plan had been considered by the Comptroller and rejected. The trial court heard the case and held that the Comptroller had not acted arbitrarily in rejecting the plan. This court said that upon a review of the record it was convinced that the Comptroller had acted within his statutory authority; hence, that his action was not arbitrary or capricious. No question was involved in that case as to the duty of the Comptroller to consider a proposal for reorganization which has not yet reached a stage where it can be called a plan. The record in the present case reveals that the Comptroller had expressed willingness to consider such a plan if and when one should be presented to him by a committee authorized to act. However, the record also clearly reveals that no such plan had been prepared, and, further, that no committee had been set up for the purpose. The complaint in the present case was filed on April 28, 1939; amendments were filed on July 24, 1939; a *supplement* to the amended complaint was filed on November 24, 1939. In this *supplement* appellant alleged that the Comptroller agreed on May 24, 1939, to receive and consider a plan, if and when plaintiff presented one; he attached, as an exhibit to this *supple-*

---

[3] 63 App.D.C. 311, 72 F.2d 179.

*ment*, a copy of a letter bearing date of October 20, 1939, written by himself, to Senator Prentiss M. Brown, which shows on its face that (1) no plan had been presented; (2) no plan had been prepared; (3) no committee had been set up for the purpose of preparing a plan; (4) the various interests involved had not even agreed upon a committee. Appellant attached also to the *supplement*, as an exhibit, a list, also bearing date of November 24, 1939, for a "Liquidation Plan Committee (Suggested)" containing nineteen names. It was also in this *supplement*—filed on November 24, 1939—that appellant requested the lower court to appoint a committee of eleven "to formulate and present to this court such a plan * * * which will fairly represent the interests of the depositors and stockholders of said First National Bank-Detroit, and give said Committee due authority so to do." It is unnecessary to do more than to set out the foregoing facts to indicate how completely this case differs from the case of Cooper v. Woodin; and how completely appellant has misconceived the law which governs the exercise by the Comptroller of the discretionary powers vested in him.[4]

 The complaint also contains allegations of conclusions of law to the effect that (1) the Comptroller and the Receiver willfully breached their duty as to the receivership of the First National Bank-Detroit; (2) in that the acts and omissions of the Comptroller were the acts and omissions of his predecessor in office; (3) appellee Delano, the present Comptroller, is accountable for the acts of his predecessor. In support of these conclusions it was alleged, further, that since 1863 it has been the duty and practice of all comptrollers of the currency speedily and economically to wind up the affairs of closed banks. *Upon information*, allegations of the complaint set forth at length statistics on national bank receiverships and the liquidation of banks from 1933 to 1937; concluding therefrom that the different comptrollers of the currency "well knew and understood that the *average* National Bank Receivership and its handling and administration, was to be considered successful and of advantage to the depositors of said closed National Banks, when: '(a) Its depositors received the equivalent in total dividends from 80 to 85% of their total deposits. (b) Within three to four years of the closing of the National Bank, and (c) That this result could frequently be accomplished after the Bank Holiday of March, 1933, by borrowing from the Reconstruction Finance Corporation.'" (Italics supplied) The plaintiff further alleged that the Comptroller learned by his experience in such matters, that the percentage of costs of liquidation progressively increased from the date of failure or closing of a national bank to the date of closing or terminating its receivership; as a result of which knowledge the Comptroller speedily wound up the affairs of the Guardian National Bank of Commerce of Detroit, but refused, neglected and willfully omitted to wind up the affairs of the First National Bank-Detroit. The complaint then set forth at length the plan alleged to have been used for the liquidation of the Guardian National Bank of Commerce; as a result of which—so it is alleged—it was speedily wound up; all depositors were well satisfied, no one has ever complained thereof, and "millions of dollars in Receiver's salaries, legal expenses and general expenses were saved to the depositors and stockholders of said Guardian National Bank of Commerce of Detroit * * *." The complaint then continues: "Plaintiff further shows and

---

[4] Fraudulent sale (Baker v. Schofield, 243 U.S. 114, 118, 37 S.Ct. 333, 61 L. Ed. 626); pretended sale and attempted delegation of receiver's powers and duties (Jackson v. McIntosh, 5 Cir., 12 F.2d 676, certiorari denied, 273 U.S. 697, 47 S.Ct. 93, 71 L.Ed. 846); sale made without proper court order (Whelan v. Blankenbeckler, 5 Cir., 87 F.2d 81; Armstrong v. Woolley, 5 Cir., 89 F.2d 295); assets illegally paid out (O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.2d 146, affirmed, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733); exercise of discretion within scope of comptroller's power may not be set aside except for fraud (Adams v. Nagle, 303 U.S. 532, 540, 542, 543, 58 S.Ct. 687, 82 L.Ed. 999; Smith v. Witherow, 3 Cir., 102 F.2d 638, 641); comptroller not liable for acts performed within the scope of his official duties (Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, 118 A.L.R. 1440, certiorari denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414; Id. at 70 App.D.C. 238, 240, 105 F.2d 761, 763; Id. at 71 App.D.C. 6, 8, 107 F.2d 207, 209, certiorari denied, 308 U.S. 615, 60 S.Ct. 263, 84 L.Ed. 514). Cf. United States Sav. Bank v. Morgenthau, 66 App.D.C. 234, 237, 238, 85 F.2d 811, 814, 815, certiorari denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446.

charges * * * that as hereinafter set forth * * * [the Comptroller and Receiver] could have terminated the receivership of said First National Bank-Detroit * * * in substantially the same way and under substantially the same plan as that used in the final liquidation of the Guardian National Bank * * *." Then follow, *upon information*, allegations that the Comptroller and Receiver "deliberately and steadfastly neglected and refused * * * to permit, assist in or approve any plan or method for speedily winding up the affairs of said First National Bank-Detroit and terminating its said receivership—which said acts and omissions have resulted in large sums of money totalling over $1,150,-000.00 belonging to the depositors and stockholders of said First National Bank-Detroit, being used for claimed attorneys' fees and legal expenses of said receivership by defendant Receiver B. C. Schram and his predecessor Receiver, in the liquidating of said First National Bank-Detroit from its closing in February 1933, to date —which sums have actually been paid out or a liability therefor incurred by said Comptrollers of the Currency and Receivers, to certain special attorneys (appointed by a previous Comptroller of the Currency) and their associates, and to the Legal Division of the Comptroller of the Currency's office in Washington. *Upon information,* that a considerable part of said attorneys fees and legal expenses arises from wholly unnecessary duplication of legal services and advice attempted to be rendered said Receivers of said Bank, by said Legal Division in the Comptroller's office in Washington on the one hand, and by said Receiver's attorneys in Detroit, Michigan, on the other hand." As we have pointed out elsewhere, appellant's own pleadings, supplements and exhibits reveal the falsity of this latter allegation. Moreover, the foregoing summary is convincing in showing the inadequate basis upon which rest appellant's charges of improper payment of fees and expenses, namely, that because the *average* time for winding up the affairs of closed banks is shorter than that used in the present case, because the time expended in winding up another Detroit bank approximated the average time, and because the same plan for liquidating the other Detroit bank was not used in connection with the First National Bank-Detroit, therefore, appellant concludes, the expenditures were improper. All this is then bolstered by a further allegation *upon information* to the effect that the way in which legal services are performed in the Comptroller's office causes unnecessary duplication and expense.

It is obvious that all this provides no basis upon which to charge that the Comptroller has abused his discretion, or engaged in illegal activities in connection with the assets of the closed bank. The very word *average* as used in appellant's compilations of statistics shows that the period which elapses in winding up one bank differs from that which elapses in winding up another. The varied complications which arise in the liquidation of different banks constitute one of the very problems which necessitates the existence of the office of Comptroller of the Currency.[5] In working out those complications it is necessary that the Comptroller shall be vested with wide discretion.[6] If he could be required to go into court at the whim of a depositor to explain why, in each case, he has failed to wind up the affairs of a bank in average time, it is obvious that the average time would soon be greatly extended.[7] There is nothing in

[5] Cf. Korbly v. Springfield Inst. for Sav., 245 U.S. 330, 333, 38 S.Ct. 88, 62 L.Ed. 326; Liberty Nat. Bank v. McIntosh, 4 Cir., 16 F.2d 906, 908, 909.

[6] Cf. Adams v. Nagle, 303 U.S. 532, 540, 58 S.Ct. 687, 82 L.Ed. 999; United States Sav. Bank v. Morgenthau, 66 App. D.C. 234, 237, 85 F.2d 811, 814, certiorari denied 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446.

[7] Adams v. Nagle, 303 U.S. 532, 540, 541, 58 S.Ct. 687, 692, 82 L.Ed. 999: "Plainly these are questions for the exercise of administrative discretion. The necessity for vesting this power in an administrative officer springs from the desirability of prompt liquidation. It would be intolerable if the Comptroller's decision could be attacked collaterally in every suit by a receiver against the shareholders to collect the amount of the assessment. It is settled this cannot be done. It would be equally intolerable if stockholders as a class could call upon a court to review the Comptroller's exercise of his discretion. For a court to entertain a suit for this purpose would be to render nugatory the functions Congress has confided in the Comptroller. It has often been decided this may not be done."

the allegations heretofore summarized even to suggest improper actions upon the part of the Comptroller, or anything which suggests more than a difference of opinion between him and a depositor, as to the procedure which should have been followed and the time which should have elapsed in liquidating the bank; and as to this difference of opinion the Comptroller's determination must control.[8] Finally, far from alleging facts sufficient to show—if proved—that the Comptroller has paid out unreasonably large fees and expenses, the allegations of the complaint, upon this subject, conclude with the revelation that appellant does not even **know** the amounts and details of such fees and expenses. The conclusion is obvious that the preceding allegations *upon information* are pure guesswork and the suit a fishing expedition.

Appellant's reply brief seems to be based upon the theory that it was the duty of the Comptroller to take the initiative in helping or cooperating "in working out a plan to end this receivership." He complains that the Comptroller "refused to consider the names of many of the most prominent men of Detroit as such a Committee;" and that "nothing was ever done by the Comptroller about this list submitted by appellant." He refers to a letter which he received from the Comptroller, in which—he contends—the Comptroller refused to give appellant any of the necessary information "until a Committee had been approved by the Comptroller." What was actually said in that letter follows: "You will recall that in the conference which you attended in Washington last week, the Comptroller indicated that his mind was

entirely open for consideration of a proper plan for that purpose, but that it must be initiated and sponsored by a *representative group of responsible depositors and shareholders of the bank*. We feel that preliminary information concerning the assets and liabilities of the bank as a basis for the formulation of such a plan should be furnished *only after an approved group or committee has been organized* for the purpose of carrying forward such a plan, and that such information should not be furnished to any individual but only to such a group or its representative. We feel that this is the more appropriate procedure, and that it is consistent with the discussion occurring in the course of the conference of last week." (Italics supplied) In any event, the Comptroller has no such duty as that suggested by appellant. His duty is, as the law specifies, to go forward with settlement of the affairs of an insolvent bank.[9] If a committee is formed upon the initiative of interested persons, and a plan for reorganization or liquidation presented to the Comptroller, it may become his duty to consider the proposal and to act upon it. Having done so his action may be reviewed to determine whether it was fraudulent, or whether he acted within the proper range of his discretion.[10] That appellant, a depositor in the bank, had written a number of letters to the Receiver, to the Comptroller, and others, suggesting the possibility of reorganization or liquidation; asking information about the affairs of the bank, as a basis upon which he might proceed to attempt to secure the setting up of a committee; or that he had volunteered the names of a large group of men who might

---

[8] United States Sav. Bank v. Morgenthau, 66 App.D.C. 234, 237, 85 F.2d 811, 814, certiorari denied, 299 U.S. 605, 57 S. Ct. 232, 81 L.Ed. 446: "It is plain that the difference between the respective parties regarding the solvency or insolvency of the Bank rests upon an estimate of the value of the securities held and property owned by the Bank during this period. The Comptroller determined that the Bank was yet insolvent, whereas the president of the Bank contends that it had regained its solvency. This mere contradiction, standing alone, compels the court to accept the official determination of the Comptroller. It has been held by a long array of authorities that, where the Comptroller of the Currency has held a bank to be insolvent and has appointed a receiver for it, the court will not substitute its judgment for the judgment of

the Comptroller, unless it appears by convincing proof that the Comptroller's action *is plainly arbitrary, and made in bad faith*." (Italics supplied)

[9] 12 U.S.C.A. §§ 191, 192.

[10] Cooper v. Woodin, 63 App.D.C. 311, 72 F.2d 179. Cf. Davis Trust Co. v. Hardee, 66 App.D.C. 168, 170, 85 F.2d 571, 573, 107 A.L.R. 1425; United States Sav. Bank v. Morgenthau, 66 App. D.C. 234, 237, 238, 85 F.2d 811, 814, 815, certiorari denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446. Cf. also, Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, 118 A.L.R. 1440, certiorari denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414; Id. at 70 App.D.C. 238, 240, 105 F.2d 761, 763; Id. at 71 App.D. C. 6, 8, 107 F.2d 207, 209, certiorari denied, 308 U.S. 615, 60 S.Ct. 263, 84 L. Ed. 514.

be interested in forming such an organizing committee; no one of these facts or all of them together, provide any basis upon which to say that the Comptroller had neglected his duty; failed to comply with the law; or exercised his discretion in any manner which calls for investigation by a court of equity, to determine whether he acted arbitrarily, not in good faith, fraudulently, illegally, or otherwise.

Appellant next contends that if a national bank receiver has sufficient assets on hand with which to satisfy all creditors, the receivership may be terminated by proper application to a court of equity. This contention must fail as applied to the present case, because no proper application was made to the lower court to call for termination of the receivership. To support his contention, appellant relies solely upon our decision in United States Savings Bank v. Morgenthau;[11] which, however, far from supporting the position of appellant supports, instead, the position of the Comptroller. In that case we held that determination of the solvency or insolvency of a bank depends upon an estimate or appraisal of the value of its securities; this calls for the exercise of judgment and discretion; where there is a dispute as to whether or not the Comptroller's determination of insolvency was correct, that determination must be accepted and the court will not substitute its judgment for the judgment of the Comptroller, unless it appears by convincing proof that the Comptroller's action is plainly arbitrary, and made in bad faith. In the present case no well pleaded facts appear in the complaint to show that the actions of the Comptroller or Receiver were arbitrary or done in bad faith.[12] To the contrary, the allegations of the complaint consist of (1) conclusions of law; (2) fallacious arguments on questions of law, which would be improper in a pleading even if they were not fallacious; and (3) allegations *upon in-*

*formation,* concerning collateral and immaterial issues. Thus, there are set out in the complaint, the two following paragraphs:

(20) (a) Said defendants, Comptroller of the Currency and Receiver of said First National Bank-Detroit, have never disclosed and made known to plaintiff, and the other general creditors or depositors of said closed First National Bank-Detroit, the itemized, detailed statements of what were the "secured liabilities" of said First National Bank-Detroit amounting to $43,697,447.59 in February, 1933, which said Receiver illegally, and without any warrant of law, paid to said secured creditors (depositors) in the years 1933 to 1935, such illegal payments totalling in all the sum of $45,169,455.54, as shown by Exhibit C hereto attached.

(b) Further in that connection, plaintiff shows and charges that all of said payments of $45,169,455.54 of said alleged "secured liabilities" were paid contrary to law and that said payments of $45,169,455.54 operate as a fraud upon the rights of all general depositors of said First National Bank-Detroit, and that an accounting thereof should be had for the benefit of all the general creditors (depositors) of said First National Bank-Detroit.

These argumentative conclusions of law are not admitted by the motion to dismiss.[13] Moreover, without reference to Exhibit C they are meaningless. Exhibit C is a "Statement of Condition" of the First National Bank-Detroit, presumably issued by the Receiver or the Comptroller as of December 31, 1938. In this Statement, under the heading, *Liabilities,* appears one item which reads "Secured and Preferred Liabilities Paid in Cash . . . $45,169,455.54." In order to support the pleaded conclusions of law the complaint then sets out an argument which purports to interpret the law of the United States and the law of Michigan concerning the pledging of assets

---

[11] 66 App.D.C. 234, 237, 85 F.2d 811, 814, certiorari denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446.

[12] Cf. United States Sav. Bank v. Morgenthau, 66 App.D.C. 234, 237, 85 F.2d 811, 814, certiorari denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446.

[13] Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853: "A motion to dismiss, like a demurrer, ad-

mits only facts well pleaded."; Fletcher v. Jones, 70 App.D.C. 179, 181, 105 F.2d 58, 60, certiorari denied, 308 U.S. 555, 60 S.Ct. 116, 84 L.Ed. 467: "The allegation quoted constituted a conclusion of law. The correctness of such a conclusion is not admitted by a motion to dismiss, especially when, as here, its incorrectness *is* clearly revealed by the very statute from which the conclusion purports to be drawn."; Green v. Brophy, 71 App.D.C. 299, 304, 110 F.2d 539, 544.

of a national bank. Even assuming its propriety in a pleading, this argument fails to suggest improper action upon the part of the Comptroller or Receiver, because (1) it speaks in terms of general acts of Congress and implied powers of national banks "in the years of 1930 to the closing of the First National Bank-Detroit in February, 1933," without regard to federal laws, and powers of such banks prior to 1930;[14] (2) it speaks in terms of federal laws concerning the pledging of assets to secure *private* deposits and deposits of *states* or subdivisions thereof, without regard to the fact that the federal laws have for many years permitted a national bank to pledge its assets to secure deposits of federal funds and to secure money which it has borrowed;[15] (3) it shows upon its face that security may be given for safe-keeping of public money of a state or public subdivision, pursuant to the provisions of the federal law;[16] (4) it shows upon its face that security may be given under the laws of the State of Michigan for the safe-keeping of public money of either the state or of the federal government; (5) it shows upon its face that the cases cited in the complaint have to do with the recovery, by the Receiver, of assets pledged for the security of private deposits,[17] or for the security of public money of a state, in states which—unlike Michigan—do not permit such pledging of assets by state banks;[18] (6) it admits, expressly: "Plaintiff is uninformed as to the portions of said

'secured liabilities' represented by public or private moneys deposited pursuant to some special act of Congress, such as postal savings funds." Following these conclusions of law, and equivocal arguments, there appears in the complaint an allegation *upon information* "that no 'written order of the Commissioner of the Banking Department of the State of Michigan' was ever made authorizing any pledging of any assets of said First National Bank-Detroit, as collateral security, to any creditor or depositor * * * or any other liabilities of said National Bank." But no such order was necessary to permit the pledging of assets of a national bank to secure its borrowings, or to secure deposits of federal public funds;[19] whatever may be true as to deposits of state funds. Then follows an allegation: "That it would be a useless and futile effort to make a prior demand upon the said defendants for the information covering the matters specified in paragraphs 18, 19 and 20 of this complaint [payment of attorneys' fees, expenses and secured liabilities], and to make a prior demand upon said defendants to bring suit for such portions of said legal expenses and fees and secured liabilities *as were unlawfully and improperly paid out by them to third persons.*" (Italics supplied) As has been heretofore pointed out, the pleadings allege no facts which provide any basis for the charge that such payments were unlawful or improper. This allegation, therefore, is meaningless.

[14] See authorities collected in O'Connor v. Rhodes, 65 App.D.C. 21, 25, 79 F.2d 146, 150, affirmed, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733.

[15] Inland Waterways Corp. v. Young, 309 U.S. 517, 520 et seq., 60 S.Ct. 646, 84 L.Ed. 901; Texas & Pacific Ry. v. Pottorff, 291 U.S. 245, 257, 258, 259, 54 S.Ct. 416, 78 L.Ed. 777; McNair v. Knott, 302 U.S. 369, 371, 58 S.Ct. 245, 247, 82 L.Ed. 307: "Since the banking act of 1863 Congress has passed many laws requiring that security be given to protect deposits of certain public funds."; O'Connor v. Rhodes, 65 App.D.C. 21, 26, 79 F.2d 146, 151, affirmed, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733: " * * * wherever Congress by express authority directs the custodian of federal funds, without regard to whether they be technically public or private funds, to deposit them in a national bank and to exact security from the bank for their repayment, the duty thus imposed on the

custodian authorizes the bank to give the security or make the pledge."

[16] Appellant cites Act of June 25, 1930, 46 Stat. 809, 12 U.S.C.A. § 90: "Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safe-keeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State.", and Act No. 21 of Public Acts of 1931 of the State of Michigan, as amended by Act No. 32 of Public Acts of 1932 (Extra Session).

[17] Texas & Pacific Ry. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777.

[18] Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787. Cf. Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794.

[19] O'Connor v. Rhodes, 65 App.D.C. 21, 26, 79 F.2d 146, 151, affirmed, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733.

Finally, therefore, it appears that apart from conclusions of law, equivocal arguments upon questions of law, and allegations concerning collateral, immaterial matters, nothing appears in appellant's pleadings to support the serious charges which are made against the Comptroller and Receiver. Contrary to appellant's assumption, the Receiver and the Comptroller are not subject to the general equity rule that a trustee is amenable to an accounting to his cestui que trust.[20] Especially in view of the presumption of proper performance of duty by public officials,[21] no showing was made by the pleadings in this case sufficient to require consideration by a court of equity. In saying this, of course, we do not wish to be understood as approving a secret administration of an insolvent bank. On the contrary, and particularly in the matter of payment of preferred claims and expenses, including counsel fees, there should be as complete disclosures as the proper administration of the estate makes possible. The Receiver as the alter ego of the Comptroller, and in whose office his reports are filed, should not refuse to disclose information concerning his official acts when proper application for the information is made. But here, for the reasons we have set out, we do not find a violation of this fundamental rule.

Affirmed.

---

[20] Cooper v. O'Connor, 70 App.D.C. 238, 105 F.2d 761; Id. at 71 App.D.C. 6, 107 F.2d 207, certiorari denied, 308 U. S. 615, 60 S.Ct. 263, 84 L.Ed. 514.

[21] United States Sav. Bank v. Morgenthau, 66 App.D.C. 234, 237, 85 F.2d 811, 814, certiorari denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446; United States v. Chemical Foundation, Inc., 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L.Ed. 131;

Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, certiorari denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414; Proctor & Gamble Co. v. Coe, 68 App.D. C. 246, 249, 96 F.2d 518, 521, certiorari denied, 305 U.S. 604, 59 S.Ct. 65, 83 L. Ed. 384. See Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Lewis v. United States, 279 U.S. 63, 73, 49 S.Ct. 257, 73 L.Ed. 615.