**SCHAD et al. v. TWENTIETH CENTURY-FOX FILM CORPORATION et al.**

**No. 8068.**

Circuit Court of Appeals, Third Circuit.

Argued Nov. 17 and 18, 1942.

Decided June 21, 1943.

Harry Shapiro, of Philadelphia, Pa. (William B. Rudenko, of Philadelphia, Pa., on the brief), for appellants.

Morris Wolf, Philadelphia, Pa. (Charles H. Weidner, of Reading, Pa., C. Brewster Rhoads, Montgomery, McCracken, Walker & Rhoads, Wm. A. Schnader, Bernard G. Segal, and Howard S. McMorris, all of Philadelphia, Pa., John F. Caskey, of New York City, Schnader & Lewis, of Philadelphia, Pa., and Dwight, Harris, Koegel & Caskey, of New York City, on the brief), for appellees.

Before BIGGS, MARIS, and JONES, Circuit Judges.

MARIS, Circuit Judge.

The plaintiffs brought a civil action in the District Court for the Eastern District of Pennsylvania seeking injunctive relief and treble damages for the injuries which they allege they suffered as a result of an unlawful combination and conspiracy by the defendants in violation of the anti-trust acts. The action was tried by the court without a jury. After the plaintiffs completed the presentation of their evidence the defendants moved pursuant to Civil Procedure Rule 41(b), 28 U.S.C.A. following section 723c, for a dismissal upon the ground that upon the facts and the law the plaintiffs had shown no right to relief. The court granted the motion for involuntary dismissal and entered judgment dismissing the complaint. This appeal followed.

## I. The Procedural Question.

Rule 41(b) provides: " * * * After the plaintiff has completed the presentation

of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits."

In Federal Deposit Ins. Corporation v. Mason, 3 Cir., 1940, 115 F.2d 548, we held that an order of dismissal under this rule is the equivalent in a non-jury case of a directed verdict for the defendant in a jury case as authorized by Rule 50(a). Upon a motion by the defendant for a directed verdict at the close of the plaintiff's evidence it becomes the duty of the trial judge, after viewing the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the plaintiff, to determine whether, as a matter of law, his evidence makes out a case upon which the law will afford relief.[1] If the trial judge decides this question, which is solely one of law, in favor of the defendant and directs a verdict in his favor, the verdict of the jury obviously involves no appraisal of the weight or credibility of the evidence nor any finding of basic or circumstantial facts. It is merely a formal finding, pursuant to the trial judge's instruction, that upon the facts as the plaintiff's evidence shows them to be and upon the applicable rules of law the plaintiff has shown no right to relief. It presents to an appellate court upon appeal the same question of law which was before the trial judge.[2]

We think that the same is true in respect of a motion in a non-jury case for involuntary dismissal under Rule 41(b). The sole question presented to the trial judge by such a motion is one of law, namely, whether the plaintiff's evidence and all the inferences fairly to be drawn from it, considered in the most favorable light, make out a prima facie case for relief. This likewise is the question presented upon appeal. Since, if the motion is not granted the defendant may proceed to offer his evidence, it seems clear that when

a motion for involuntary dismissal is made under Rule 41(b) the trial has not so far progressed as to be ready for fact findings.

The defendants urge, however, that Civil Procedure Rule 52(a) requires fact findings by the trial judge upon the disposition of such a motion for dismissal and that accordingly the only question before us on this appeal from the order of involuntary dismissal entered under Rule 41(b) is whether the trial judge's fact findings are clearly erroneous. Rule 52(a) provides: "In all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *."

This rule, however, refers only to cases in which the trial has reached the stage where the evidence is all in and fact findings are consequently appropriate. It can have no application to a case where the plaintiff alone has been heard upon the facts, and the defendant has reserved the right to present his version of the facts later if it is determined that the plaintiff has made out a prima facie case. To construe Rule 52(a) as the defendants would have us do is to our minds unthinkable. Thus construed it would plainly deny to a defendant the right to have his evidence heard and considered before the facts are found by the court, in the teeth of the guarantee by Rule 41(b) that a defendant moving for dismissal does not thereby waive "his right to offer evidence in the event the motion is not granted." Such a construction might well violate the due process clause of the Fifth Amendment.

The defendants point out that a dismissal motion under Rule 41(b) is based upon the ground that "upon the facts and the law" the plaintiff has shown no right to relief. They urge that the decision of such a motion accordingly involves an adjudication of the facts. We have already indicated, however, that "the facts" referred to in the rule are the prima facie facts shown by the plaintiff's evidence taken in the light most favorable to him

---

[1] Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 6 Cir., 1906, 147 F. 641.

[2] Gunning v. Cooley, 1930, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720.

and that no weighing of the evidence is contemplated. As we have already pointed out the facts are to be considered in the same way as upon a motion for a directed verdict.

We find nothing in the rules which contemplates that findings of fact may be made at the close of the plaintiff's case and later revised in the light of the defendant's evidence. Nor is there anything to suggest that when a motion for dismissal is made under Rule 41(b) the trial judge shall make findings if he grants the motion but not if he denies it. We, therefore, conclude, in accord with our ruling in the Mason case, that upon the present appeal we must examine the evidence to determine whether the trial judge was warranted by the plaintiffs' failure to make out a prima facie case in dismissing their complaint pursuant to Rule 41(b).[3]

## II. The Facts.

### The parties:

The plaintiffs are exhibitors of motion pictures in Reading, Pennsylvania. They have been the owners of the Astor Theatre since 1935 and exhibited pictures there prior to 1926 and since May, 1941. The defendant Warner[4] is a producer, distributor and exhibitor. It operates more than 130 theatres in eastern Pennsylvania, southern New Jersey and Delaware, which territory is known to the motion picture industry as the Philadelphia exchange area. In Philadelphia Warner operates the ten center city first run theatres and 16 of the 19 neighborhood first run theatres. Prior to May 2, 1941 Warner operated the Astor and the Ritz in Reading; thereafter it operated the State, now called the Warner. The defendant Fox[5] is a producer, distributor and exhibitor. It operates theatres throughout the United States but does not operate theatres in the Philadelphia exchange area. The defendant Wilmer & Vincent[6] is an exhibitor and operates theatres in Pennsylvania and elsewhere. Prior to May 2, 1941 it operated the Embassy and State in Reading. Since that time it has operated the Embassy and the Ritz.

### Theatres in Reading:

Before the expiration of the Warner lease of the Astor in May, 1941 there were in Reading four class A theatres which showed the best first run motion pictures, namely, the Astor owned by the plaintiffs and operated by Warner, the Embassy operated by Wilmer & Vincent, the Colonial, operated by Loew's, Incorporated, and the Park, operated by Emanuel, McNamee and Keeney. After the expiration of the lease the State became a first run theatre operated by Warner which renamed it the Warner. The Capitol is outside the theatre district. The Ritz, a B grade theatre, was formerly operated by Warner but since May, 1941 has been operated by Wilmer & Vincent.

### The cause of the controversy:

The plaintiffs claim that Warner, acting in combination with Wilmer & Vincent and with Fox, wrongfully deprived the Astor of Fox films with the object of ruining the Astor or of reacquiring it at a sacrifice to the plaintiffs. For many years the Fox product in Reading was equally divided between Warner at the Astor and Wilmer & Vincent at the Embassy. In the 1933-34 and 1934-35 seasons Fox and Warner had a dispute. In those two seasons Fox licensed all its product exhibited in Reading to Wilmer & Vincent. In 1935 the dispute was settled and Fox, over the protest of Wilmer & Vincent, retransferred one-half of its product to Warner. Each year thereafter Wilmer & Vincent requested all the Fox product but was granted only one-half, the other half going to Warner. Warner exhibited its share of the Fox pictures at the Astor. In 1940 the situation changed. The Warner lease on the Astor was to expire May 2, 1941. Warner sought to extend the term of the lease at an annual rental of $87,500. The plaintiffs insisted upon $100,000. Their

---

[3] Compare the ruling in Thomas v. Peyser, 1941, 73 App.D.C. 155, 118 F. 2d 369, 374. See also Lucking v. Delano, 1941, 74 App.D.C. 134, 122 F.2d 21, 22. Insofar as Young v. United States, 9 Cir., 1940, 111 F.2d 823 and Gary Theatre Co. v. Columbia Pictures Corporation, 7 Cir., 1941, 120 F.2d 891 are contra to our ruling we do not find their reasoning persuasive.

[4] Warner Bros. Pictures, Inc., Warner Bros., Circuit Management Corporation, Warner Bros. Theatres, Inc., Stanley Company of America and Vitagraph, Inc.

[5] Twentieth Century-Fox Film Corporation.

[6] Wilmer & Vincent Theatre Co., Wilmer & Vincent Amusement Company and Berks Amusement Company, Inc.

investment in the Astor was approximately $925,000. The negotiations were unsuccessful. In September, 1940 Warner began negotiations with Wilmer & Vincent for the rental of the State and an agreement was reached some time in October, 1940. The plaintiffs did not learn until November 12, 1940 that Warner did not intend to renew the lease of the Astor. Wilmer & Vincent, which had been seeking the right to exhibit the entire Fox product, now conditioned its agreement to lease the State to Warner upon Warner's relinquishing its claim to one-half of the Fox product. On November 7, 1940 Warner surrendered its Fox contract and on November 29, 1940 Fox executed a contract giving Wilmer & Vincent all of the Fox product for a three year period, the Fox pictures to be exhibited at the Embassy and the Ritz. From November, 1940 to May, 1941 Warner operated the Astor without Fox pictures. After Warner moved to the State it exhibited Vitagraph pictures alone. After May, 1941 the plaintiffs, who were without sufficient pictures to run at the Astor, entered into a five year pooling agreement with Emanuel and his associates whereby the best pictures available to the pool were to be played at the Astor and the less important pictures at the Park. The pooling agreement costs the plaintiffs $50,000 a year. During the 1940-41 season Wilmer & Vincent had under contract 70 pictures, each to be exhibited for a week. Some of the Fox films were exhibited at the State or Ritz, which theatres paid lower rentals for them than the Embassy or Astor.

These are the undisputed facts. The plaintiffs would have us draw from these facts certain inferences which would tend to support their charge of a conspiracy by the defendants in restraint of trade. Since these inferences concededly must be drawn if the plaintiffs are to be held to have made out a prima facie case for relief we will proceed to state and comment upon those principally pressed.

(a) Warner wished to ruin the Astor or reacquire it as part of its own circuit exhibition monopoly and for that reason did not renew its lease. It is just as reasonable to infer from the facts in evidence that Warner didn't renew the lease because in its business judgment the rent was too high. Indeed, such an inference is much more plausible in view of the course which the negotiations followed with the plaintiffs and with Wilmer & Vincent.

(b) Warner took the Fox pictures away from the Astor in order to ruin the Astor. It is undisputed that Wilmer & Vincent always wanted all the Fox pictures. Wilmer & Vincent quite naturally took advantage of Warner's need for a theatre to obtain a release from Warner of its contractual right to half of the Fox pictures. It would have been a much less complicated and equally effective method for Warner to take the Fox films with it to the State if the object was to ruin the Astor.

(c) Warner coerced Fox into transferring the rights to the Fox product to Wilmer & Vincent. To support such an inference the plaintiffs argue that since Warner has a monopoly of first run theatres in Philadelphia and if Fox wishes its pictures exhibited in Philadelphia it must do so in Warner theatres, Warner was in a position to coerce Fox and therefore Fox must have made the transfer under coercion. The fact that Fox actually took its product away from Warner for two full seasons in 1933 and 1934 and that at no time thereafter did it give Warner more than half of its product is rather convincing that Warner was not in a position to dictate to Fox in matter involving Fox's financial self interest. Moreover Fox had in the past dealt with Wilmer & Vincent of its own free will and without the intervention of Warner and had found the association financially satisfactory to itself. It is an equally reasonable inference to draw that Fox preferred to license Wilmer & Vincent rather than any other Reading exhibitor since, except for Warner, it had licensed Wilmer & Vincent exclusively for many years.

(d) Fox must have been coerced into the transfer because the exhibition of many of its 1940-41 pictures at the State and Ritz at a lower film rental than would have been paid by the Astor or the Embassy resulted in a loss to Fox. The argument for this inference is based upon the premise that the sole reason for the failure to exhibit all of the Fox pictures at the Embassy was because the Embassy was overbought for the season and consequently unable to give the Fox pictures exhibition time. There is evidence that the Embassy was overbought but no evidence that it was overbought in grade A pictures suitable for a week's run at a first run theatre. There is overwhelming evidence that much of the 1940-41 Fox product was not suitable for such theatres as the Embassy or

the Astor. The direct and uncontradicted evidence is that all the pictures suitable for such theatres as the Embassy or the Astor during the 1940-41 season were exhibited at the Embassy or the Astor.

■ The other inferences sought by the plaintiffs to be drawn from the evidence are equally unsupported, and need not be discussed in detail. We, therefore, have the situation where the facts shown by the evidence tend equally to sustain either of two inconsistent inferences. The law is well settled that under such circumstances neither inference can be said to be established. Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819.

### III. The Law.

We come now to the law applicable to the facts and inferences which we have already detailed. The plaintiffs' claim for treble damages is based upon Section 4 of the Clayton Act which provides: "Sec. 4. Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

The antitrust laws to which reference is made are sections 1 and 2 of the Sherman Anti-Trust Act which provide:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *." 15 U.S.C.A. § 1.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *." 15 U.S.C.A. § 2.

■ Since the transaction of which the plaintiffs complain resulted in Warner having less control of the exhibition of motion pictures in Reading than before its removal to the State Theatre Section 2 of the Sherman Anti-Trust Act, which deals with a monopoly or an attempt to monopolize can have no bearing. The sole issue, therefore, is whether the plaintiffs' evidence would sustain a finding that the defendants violated Section 1 of the act.

In Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, the leading case relied upon by the plaintiffs, the Government obtained a decree restraining the defendants from continuing in a combination and conspiracy condemned by the court as a violation of section 1 of the Sherman Anti-Trust Act and from enforcing or renewing certain contracts found by the court to have been entered into in pursuance of the conspiracy. The defendants were distributors and exhibitors of motion picture films. Two of the exhibitors were affiliated corporations which exhibited motion pictures in Texas and dominated the motion picture business in the cities where their theatres were located. Interstate Circuit, Inc., one of the exhibitors, in a letter sent to each of the distributors, each letter naming all of the distributors as addressees, demanded that the exhibitors "agree that in selling their product to subsequent runs, that this 'A' product will never be exhibited at any time or in any theatre at a smaller admission price than 25¢ for adults in the evening" and that "on 'A' pictures which are exhibited at a night admission of 40¢ or more—they shall never be exhibited in conjunction with another feature picture under the so-called policy of double features." The demands were met by the distributors as to theatres in Dallas, Fort Worth, Houston and San Antonio and denied as to other cities. As a result the subsequent run theatres in the four named cities either raised their prices and discontinued double features or were deprived of the right to exhibit the better grade pictures. The Supreme Court, making an independent study of the facts, concluded that the district court's finding that the distributors acted in concert and in common agreement in imposing the restrictions upon their licensees in the four above named Texas cities, was supported by the evidence. Such agreement was not a prerequisite to an unlawful conspiracy. The court said (306 U.S. at pages 226, 227, 59 S.Ct. at page 474, 83 L.Ed. 610): "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each dis-

tributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan."

In the Interstate case the restrictions imposed on the subsequent run exhibitors resulted in a drastic suppression of competition and an oppressive price maintenance. Interstate and the distributors benefited but Interstate's subsequent run competitors and the public were alike injured. There was knowledge on the part of each of the defendants of the demand being made on all, of the harsh effect compliance with the exhibitor's demands would have upon the subsequent-run exhibitors, and of the increase in admission costs which would be forced upon the public. There was an extraordinary and unexplained unanimity of action by the distributors, and a business necessity for concerted rather than individual action. Moreover, the distributors failed to call as witnesses those of their officers who were in a position to know the facts. Each of these facts contributed to the conclusion that a conspiracy existed. None of these facts appears in the case before us.

The final argument of the plaintiffs in the present case is that proof that one of the defendants, Wilmer & Vincent, has been guilty of overbuying[7] is sufficient without more, to sustain a finding that it has violated the Sherman Anti-Trust Act. They rely upon White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 1942, 129 F.2d 600, as authority for this contention. In that case the evidence was that White Bear Lake, Minnesota, which is a summer resort, for almost twenty years had but one motion picture theatre, the one operated by the defendant corporation. In 1939 the town council, over the protest of the defendant, granted the plaintiff a license to erect and operate a competing theatre. At that time the president of the defendant corporation said "I will tie all the pictures up and put them out of business inside of a year" and advised the plaintiff that it had better sell its equity in the property to the defendant as "they [i. e. the defendant] had bought all the pictures in the town and, if they had not gotten them, they would get them." The defendant held exhibitor's contracts of four of the eight major companies and a selective contract for part of the productions of a fifth company. The plaintiff negotiated with the remaining three. The defendant stepped in and purchased pictures from two leaving but one for the plaintiff. The defendant thus acquired exclusive rights to exhibit 300 pictures but despite changing programs three times a week, holiday bills and special midnight shows, it was able to exhibit but 216. This left 84 pictures for which the defendant had no use. No exhibitor in White Bear Lake, however, was entitled to exhibit these 84 films and as a result of the defendant's monopoly no member of the public could see the films that season in White Bear Lake. The defendant's monopoly resulted in an unquestioned restraint of commerce as to these 84 pictures. In contrast the evidence in the case now before us indicates that every Fox picture purchased by Wilmer & Vincent during 1940-41 was exhibited that season to the public of Reading. That some of the pictures were shown at the State or Ritz rather than at the Embassy or the Astor is of no significance when determining whether the flow of commerce has been impeded. The most that the evidence proves is that Wilmer & Vincent had under contract more pictures than it could show at the Embassy if each picture was to be exhibited for a week. There is no evidence that it had more grade "A" pictures, or that it bought the pictures so as to prevent the plaintiffs or other exhibitors from getting them, or that it was guilty of "overbuying" as that term is used in the White Bear case.

---

[7] The plaintiffs undertake to define the term as follows: "Overbuying of films is the licensing by an exhibitor of more feature pictures than are strictly necessary with the intention or result of preventing a competitor from obtaining enough feature pictures to permit normal operation." The defendant Wilmer & Vincent defines the term "Overbuying as the purchase by an exhibitor of product which it has no reasonable likelihood of playing, done for the purpose of keeping that product away from a competitor. Its manifestation is the dissipation of the product, which means either (a) that the product was not used at all * * * or (b) that the product was wasted by not receiving a proper showing."

We conclude that the evidence would not have justified a finding that the defendants entered into a combination or conspiracy in restraint of trade or that what they did restrained or monopolized trade or commerce. It follows that the plaintiffs have failed to make out a prima facie case of violation of the anti-trust laws by the defendants and that the court was, therefore, right in dismissing their complaint under Rule 41(b).

The judgment of the district court is affirmed.