**Noreen A. McGLINCHEY, Administratrix of the Estate of William Swank, Deceased,**

**v.**

**George Pierce BAKER et al.**

**Civ. A. No. 68–735.**

United States District Court, E. D. Pennsylvania.

March 22, 1973.

James E. Beasley, Philadelphia, Pa., for plaintiffs.

Anthony F. List, Media, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This is a wrongful death and survival action arising out of a grade crossing accident in Morton, Pennsylvania in

which a milk truck driven by plaintiff's decedent was struck by the defendant's passenger train.[1] Both negligence and contributory negligence were in issue. The jury returned a verdict for the defendant; before us are the plaintiff's motions for judgment n. o. v. and for a new trial.[2] The motion for judgment n. o. v. contends that under all the evidence, we should have granted plaintiff a directed verdict.[3] The motion for a new trial is bottomed upon the allegations that the verdict was contrary to the weight of the evidence and that we erred in our charge to the jury on the standard of care owed the plaintiff.[4] We shall first discuss the plaintiff's contentions stemming from her evaluation of the evidence, and shall then turn to her contentions about the charge. For reasons which will appear, the motions will be denied.

■ Although the trial abounded with conflicting contentions, there was, in retrospect, surprisingly little dispute about the facts. For purposes of the motion for judgment n. o. v., we must determine whether, viewing the evidence in the light most favorable to the defendant, and without weighing the credibility of the witnesses, the only reasonable conclusion as to the verdict was that the plaintiff must prevail. Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1210 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); Woods v. National Life & Accident Ins. Co., 347 F.2d 760 (3d Cir. 1965). On the motion for new trial, we have broad discretion to grant the motion if the jury charge was erroneous, but in considering the weight of the evidence argument, we must decide "whether sufficient evidence existed on the record which, if accepted by the jury, could sustain the verdict." Any stricter standard would tend to deprive litigants of their right to have factual issues determined by the jury. We should be particularly careful not to substitute our judgment for that of the jury in a case such as this where the subject of the testimony was relatively familiar and simple and well within the comprehension of the ordinary juror. Hourston v. Harvlan, Inc., 457 F.2d 1105 (3d Cir. 1972).

The testimony may be summarized as follows. Plaintiff's decedent was employed as a driver-salesman by Wawa Dairy Farms. On the morning of August 2, 1967, shortly before 10:00 a. m., he was driving a milk truck north on Church Road in Morton, Delaware County, when he arrived and stopped where Church Road crosses the railroad tracks

1. Jurisdiction is based on 28 U.S.C. § 1332 (diversity of citizenship).

2. The delay in disposing of these motions was occasioned principally by the fact that the official court reporter left the service of the Court and did not file the notes of testimony until ten months after the trial.

3. The standards for granting a motion for judgment n. o. v. and a motion for a directed verdict are the same. Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1210 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

4. Several other points were raised in the motions but were not even mentioned in the briefs. Most of these unpursued assignments of error relate to the charge, the submission of all issues to the jury, and the sufficiency of the evidence to support the verdict. One other point alleged prejudice resulting from statements made in defense counsel's opening statement that defendant would prove that the railroad complied with Public Utility Commission requirements for whistle posts and flashing warning lights. Plaintiff's counsel agreed at sidebar to this statement. N.T. 49. Soon thereafter plaintiff's counsel indicated at sidebar that he intended to introduce evidence that the railroad had also agreed, prior to the accident, to install crossing gates. N.T. 55. We directed counsel to brief the question of the relevance of these matters prior to the introduction of evidence thereon; we received no such briefs and no such evidence was introduced. Furthermore, we twice charged the jury that there was no evidence on the subject and that they were to disregard defendant's reference in its opening statement to the Public Utility Commission and its rules and regulations.

of defendant's Media passenger line at grade. From decedent's vantage point, defendant's east (Philadelphia) bound trains would traverse the crossing from left to right on the near track, and west (Media) bound trains would traverse from right to left on the far track. There was no gate at the crossing; the crossing was controlled by a red flashing signal light which was flashing at the time decedent arrived at the crossing and which had apparently impelled him to stop. The signal light could be activated by a train coming in either direction; a Philadelphia-bound train would activate the signal light when it reached a point 3160 feet from the crossing, and a Media-bound train would activate the signal light when it reached a point 1100 feet from the crossing.

The condition of the crossing was one of the principal bases of plaintiff's contention of negligence.[5] From where decedent was stopped, the view to his left (of the Philadelphia-bound train) was obscured by several obstacles to vision: an apartment house, a fence, a tree, and some shrubbery. Accordingly, a northbound motorist in decedent's position would have to drive very close to the track to see a Philadelphia-bound train coming from the left. And there was evidence that even from a position very close to the track, the view of the track to the west was only about 200 feet. Moreover, the roadway just south of the tracks was on a steep uphill grade, reducing visibility and increasing the difficulty of vehicle control. There was also evidence that the crossing was heavily traveled both by motor vehicles (3000 to 5000 daily) and trains (72 daily). Plaintiff relied on these facts to argue that the crossing should have been guarded by gates.

On the morning of the accident, as decedent was stopped at the crossing, a Media-bound train passed in front from his right to his left. At the same time, a Philadelphia-bound train was approaching from decedent's left, sounding its whistle. However, as soon as the Media-bound train had cleared the crossing, decedent started his truck across the tracks. Although the Philadelphia-bound train's whistle was sounding and continued to sound up until the collision, decedent did not stop, and the Philadelphia-bound train struck decedent's vehicle and dragged it some 100 feet. The train itself traveled an additional 190 feet before it stopped. Decedent was thrown out of the vehicle, suffering fatal injuries.

The engineer of the train, Mr. Ryan, testified for defendant. *Inter alia,* he testified that: (1) the train's brakes were in good condition, having been tested just prior to the run and having performed normally when applied earlier in the run; (2) the speed limit at the crossing was 25 miles per hour; (3) the train was moving at about 20 m. p. h. approaching the crossing; (4) the train's whistle was blown at the whistle posts west of the crossing, and in the required manner; (5) appropriate service applications of the brake were made to slow the train as it approached the crossing; (6) when he first saw the truck it was stopped 13 feet from the tracks; (7) the truck then started to cross the tracks; (8) the decedent was looking straight ahead until the last instant, when he turned and saw the train; (9) the train's headlight was burning brightly; (10) the crossing flasher lights were operating (they are visible from the track); (11) he placed the train in emergency as soon as he saw the truck coming across the tracks, but the train could not stop in time; and (12) the train was traveling at about 20 m. p. h. at the point of impact.

The evidence in the case most damaging to plaintiff was the testimony of Robert T. Smith, a motorist who was stopped on the other side of the crossing at the time of the accident. Smith testified that he heard the whistle of the Philadelphia-bound train before the Media-bound train cleared the crossing and

---

5. The other contention was that the train was operated in a negligent manner.

could distinguish the whistles of the two trains. He testified that the red lights were flashing as he approached the crossing and that they continued to flash as he waited at the crossing. He further testified that when the Media-bound train had passed, the milk wagon started to cross the track. Smith then motioned to decedent and shouted at him, trying to warn him that a train was coming. According to Smith, decedent proceeded across the track notwithstanding the fact that the lights were still flashing and the Philadelphia-bound train's whistle was sounding and had been sounding continuously for "a couple of seconds." Smith estimated the milk truck's speed at the time of the collision at 5 to 7 m. p. h. With regard to the direction in which decedent was looking before the accident, Smith testified as follows:

Q. When you first—were you in a position to be able to see the face of the driver of the milk truck?

A. No, I didn't see his face.

Q. Could you see any part of his body as you looked across the tracks?

A. Right. I could see the left side of him.

Q. Were you in a position to determine the direction his body was facing at that time?

A. Right. I saw—I could not see through the front windshield, but I could see through the side. And he was looking straight ahead. And the closer he came to me, the more I saw of him.

Q. Did he continue to look straight ahead?

A. Right.

Q. How about when the impact occurred?

A. He came across; he was looking straight. And the only time he saw it was when it was right there.

Q. You mean he saw what, sir?

A. He saw the train.

Q. And he didn't turn his head before then?

A. No.

We charged the jury that decedent was entitled to a presumption of due care. Since that presumption was obviously strongly challenged by Smith's and Ryan's testimony, the plaintiff introduced other evidence in an attempt to rebut the defense of contributory negligence. The thrust of the rebuttal was that conditions at the crossing were such that since it was virtually impossible to detect the approach of a train, it was not necessarily careless to drive into the path of an approaching train. Indeed, since the evidence tended to show that a motorist's view down the track just prior to entering onto the track was much shorter than a train's stopping distance, plaintiff contended that it would be futile for a motorist to bother to look for a train; he would have to rely on the flashing warning lights and the sound of the train's whistle and the noise of the train itself. Plaintiff tried to show that these other methods of detection were ineffective in the situation the decedent encountered: that the whistle was ineffective because the whistles of two trains crossing at or near the same time were indistinguishable; that the flashers were ineffective because at that crossing they were often activated for 30 to 45 minutes with no train coming when a freight car was sitting on the Philadelphia Electric Company spur near the crossing (the inference being that decedent, who passed the crossing daily while driving his milk route, might have believed that the signals were a false alarm); and that the flashers were also ineffective because the morning sunlight shone directly into the lights and made it impossible to tell whether they were flashing.

Plaintiff's contentions as to defendant's negligence derived primarily from the same facts and may be summarized as follows. First, plaintiff submitted that the defendant did not properly protect and maintain the grade crossing. Plaintiff contends that the crossing

should have been protected by a gate and a bell, in addition to the red flashing lights, because it was a very busy crossing in terms of both vehicular traffic and railroad activity; because visibility was restricted by the apartment house, fence, tree, shrubbery, and the steep grade, requiring drivers to put themselves in a position of peril in order to see down the track; because the flashing lights could be washed out by morning sunlight and could be needlessly and prematurely activated by a freight car on the Philadelphia Electric spur; and because the whistles of two trains crossing at the same time were indistinguishable. In plaintiff's view, the railroad knew or should have known of all the above dangerous conditions. Secondly, plaintiff contends that defendant was negligent by operating the train at excessive speed as evidenced by the fact that it took the train 290 feet to stop after the point of impact.

Defendant's countervailing contentions can be very simply stated. First, it contended that the crossing was adequately protected by red flashing lights, which were functioning at the time of the accident. It views the contentions of the washing out of the warning lights by sunlight, their premature activation by virtue of the nearby spur, and the indistinguishability of the whistles, as either frivolous, unproved, contradicted by other evidence, or not tantamount to negligence. As to the operation of the train, it points to the engineer's testimony that the train was being operated at the proper speed, that the whistle was sounded at the prescribed time and in the correct manner and was sounded continuously up to the point of impact, and that he made routine service brake applications at the required points and put the train into emergency stop as soon as the truck started to cross the tracks. It concludes that Mr. Smith's testimony to the effect that, as decedent started and proceeded to cross the tracks, he was looking straight ahead and did not turn his head to the left to see if there was an oncoming train is dispositive on the issue of contributory negligence, constituting affirmative evidence overcoming the presumption of due care.

■■ The testimony in the case, as summarized above, presented a classic jury question and we would have been unjustified in removing any aspect of the case from the jury's consideration. There was evidence that the railroad failed to make the crossing as safe as it might have, but it was for the jury to say whether that failure amounted to negligence. The jury could have found that the crossing was adequately guarded by lights and whistles and that the railroad exercised reasonable care. There was evidence that the decedent was careless and evidence that he was not. The resourcefulness, skill, and ingenuity that plaintiff's counsel exercised in attempting to circumvent the damaging evidence of contributory negligence was uncanny; however, that evidence required that the issue of contributory negligence be submitted to the jury, and the jury's resolution of that issue adversely to plaintiff could be sustained simply on the strength of the evidence that the decedent drove onto the tracks while the lights were flashing and the oncoming train was sounding its whistle. Indeed, contributory negligence was the one issue we might well have taken from the jury by way of a directed verdict for the defendant, not the plaintiff. A discussion of the law in that regard will be instructive.

■ The law of Pennsylvania is that a motorist must not only stop, look, and listen before entering a crossing, but also continue to look and listen as he is crossing the tracks, and failure to do either is contributory negligence as a matter of law, if proximate cause is satisfied. Witkoski v. Lehigh Valley R. R., 338 Pa. 510, 12 A.2d 908 (1940); Riesberg v. Pittsburgh & L. E. R. R., 407 Pa. 434, 180 A.2d 575 (1962); Baltimore & O. R. R. v. Muldoon, 102 F.2d

**1140**

151 (3d Cir. 1939). As was noted in Baltimore & O. R. R. v. Muldoon, *supra*:

> No principle is more firmly imbedded in the law of Pennsylvania than that a traveler who is about to cross a railroad track must stop, look and listen. This is an absolute and unbending rule of law. The stopping, looking and listening must not be merely nominal or perfunctory but substantial, careful, and adapted in good faith for the accomplishment of the end in view. Failure to comply with the duty is not merely evidence of negligence but is negligence per se, and is to be declared such by the court.

102 F.2d 152. Moreover, failure to stop, look, and listen is not excused by obstruction of view. Benner v. Philadelphia & R. Ry., 262 Pa. 307, 105 A. 283 (1918); 31 P.L.E. Railroads § 184 & cases cited at n. 53.

■■ In this case plaintiff had the benefit of the rebuttable presumption of due care on the part of the decedent. Pieseski v. Baltimore & O. R. R., 393 F. 2d 900 (3d Cir. 1968). The presumption was rebutted, however, by direct evidence that the decedent did not continue to look down the track as he crossed it.[6] In addition, the "uncontrovertible physical fact," *see id.* at 903, that decedent drove onto the track in front of the train is circumstantial evidence that he

was careless in failing to heed the flashing lights and the train's whistle, and the jury could have so found.

In Burkman v. Anderson, 324 Pa. 206, 188 A. 287 (1936), the court found the motorist guilty of contributory negligence as a matter of law where he had driven onto the track despite flashing red warning lights and a ringing crossing bell. While on the strength of *Burkman* we might have directed a verdict for defendant, we preferred to let the jury consider the contention that decedent was still not negligent because the lights were imperceptible and the train whistles indistinguishable.[7]

We turn next to plaintiff's contention that we erred in our charge to the jury on the defendant's duty of care. Our charge to the jury on defendant's duty to maintain its grade crossing was as follows:

> Now, it is the duty of a railroad, members of the jury, to exercise ordinary care under the circumstances to warn motorists of the approach of trains at a crossing by adopting a reasonably effective method commensurate with the danger at the crossing. What constitutes a reasonable and timely warning depends on the surrounding circumstances shown by the evidence of the case, such as the amount and character of the vehicular

6. The presumption that a decedent exercised due care for his safety is not evidence but rather places on the other party the burden of going forward with the evidence. Once evidence that the decedent *was* negligent is adduced, the presumption "has served its purpose and does not remain as evidence." Johnstone v. Reading Co., 248 F.2d 71, 74 (3d Cir. 1957).

7. In Johnstone v. Reading Co., 248 F.2d 71 (3d Cir. 1957), the Third Circuit affirmed a directed verdict against a plaintiff whose decedent drove past flashing lights into the path of a train whose whistle was sounding, bell clanging, and headlight burning. The evidence was that a pusher train may have been nearby on the near track and that to get a clear view down the second track, on which decedent was hit, it was necessary to drive partway onto the first track and look

from there. Plaintiff tried to discount the value of the flashing lights by the presence of the pusher train, and to discount the value of the whistle and bell by the proximity of a noisy factory. Thus on facts similar to those before us, a directed verdict based on contributory negligence was appropriate.

Conner v. Pennsylvania R.R., 263 F.2d 944 (3 Cir. 1959), was another case factually quite similar to the case before us. There the decedent drove onto the track despite flashing lights and the train's whistle, but the plaintiff adduced testimony that the lights were known to give a false alarm at times, that the whistle was sounded very late, and that the view was obstructed. The Third Circuit approved the trial judge's decision to submit the issue of contributory negligence to the jury and affirmed the verdict for the railroad.

and other travel over the crossing; the extent and character of train movement; the control and speed of trains; and the character of a highway and the crossing itself—those many factors that are on the blackboard there that you heard so much testimony and so much argument about.

Now, the railroad has no duty to give the warning in any particular manner, but may make use of any means that is reasonably adequate under all the circumstances shown by the evidence in the case. And you can already see what your duty is in this case in determining the railroad's negligence; that is to determine whether the railroad exercised ordinary care under the circumstances, under all of those circumstances, to warn motorists of the approach of trains to the crossing, this particular crossing, by adopting a reasonably effective method commensurate with the danger at the crossing. It is your estimate of the danger at the crossing; it is your estimate of the means available to the railroad and the means that the railroad used to protect the crossing which is determinative on the question of whether the railroad exercised ordinary care.

Now, there are a lot of physical facts of this case that you may consider: the angle of the crossing; the obstructions to a motorist proceeding up Blue Church Road . . . . And I suppose there has been more testimony and argument on that point than anything else. You may consider those factors: the apartment building, the trees, the bushes, the fence—all of these matters may be a part of your judgment deliberations. The volume of traffic on the highway and on the train tracks. You may consider the red flashing lights. The railroad says: Well, we had red flashing lights and red blinkers; and they were blinking. And you may consider the question of the adequacy of those red flashers under the circumstances.

Mr. Beasley introduced evidence about the sun . . . interfering with the visibility of the red flashers. And you have to consider whether you believe that testimony and whether the railroad knew of that factor or should have known of that factor in determining the adequacy of these red blinkers at the crossing under these circumstances. Mr. Beasley also introduced evidence which indicated . . . that they were not a reliable indicator of whether there was a train on the track. He had witnesses who testified that they functioned consistently when there was no train on the track. And you have to consider what you believe on that score; and what the railroad knew or should have known.

. . . The question on which there has been the most argument is the degree of visibility of the train tracks from the roadway. And of course, I suppose you could also consider the degree of visibility of the roadway from the train track, because as I will say in just a minute, the contention of the plaintiff in this case is not just that the railroad was negligent in the maintenance of the grade crossing; but also that the railroad was negligent because of the manner in which its employee, Mr. Ryan, operated the train on this particular day. But in any event . . . you have to consider the degree of visibility of the roadway from the train. But the point on which there has been the most discussion is the degree of visibility of the train track by a driver in the position of Mr. Swank, who was approaching the crossing coming up Blue Church Road from Yale Avenue towards Baltimore Pike. And of course, the plaintiff's contention is that it just wasn't visible, because of the various obstructions. But it is for you to decide what you believe now under all of the circumstances.

Once again, I will simply say that you have to determine whether under all of these circumstances the railroad

▮▮▮▮▮▮▮▮▮▮

exercised care to warn motorists of the approach of trains by adopting . . . a reasonably effective method commensurate with the danger at the crossing.

With respect to the duty of the defendant in operating its trains across the crossing, we added:

Now, with respect to the manner of operation of the train, ordinarily a railroad company must, through its engineers, firemen, and other employees, use such reasonable care and precautions in operating its trains and cars at crossings to avoid injuring a person at the crossing as the circumstances reasonably require. . . .

▮▮▮▮ We conclude now, as we did at the time we prepared the charge, that the foregoing constitutes an accurate statement of the law. A railroad is under no duty to place safety gates or any particular type of safeguard at a crossing; what is at issue is, as noted, whether the railroad adopted a reasonably safe and effective mode, commensurate with the danger at the crossing, of warning travelers of the approach of trains. See 31 P.L.E. Railroads §§ 163, 224 and cases cited therein; 1 M. Meyer, Pa. Vehicle Negl. § 9.17 and cases cited therein. In Conner v. Pennsylvania R. R., 263 F.2d 944 (3d Cir. 1959), the court approved the following charge:

Railroad trains, as we all know, sometimes travel at high speed. This high speed may be quite proper, but because of it and the great weight of a train it makes the crossing of railroad tracks by vehicles at grade crossings quite a dangerous thing. Be-

cause of the dangers involved in the use of grade crossings the law imposes upon railroads a duty at such public crossings to give adequate warning to users of the crossings of the approach of trains. This duty to give a warning varies with the circumstances at each crossing, because some crossings may be more dangerous than others. The law says in somewhat general terms that it is the duty of a railroad at grade crossings to give timely and sufficient warning of the approach of trains, taking into consideration the circumstances of each crossing, *such as the physical characteristics of the crossing, the ability of the travelers to see an approaching train, the rate of speed of the train* and the amount of vehicle traffic at the crossing.

263 F.2d at 945–46 (emphasis added).

Plaintiff has argued that we erred in not instructing the jury that the defendant had a "special duty" of care in accordance with certain language in the opinion in Fallon v. Penn Central Transp. Co., 444 Pa. 148, 279 A.2d 164 (1971).[8]

The plaintiff in *Fallon* was struck by a train at an *unguarded* crossing where the view down the track was so short that it was impossible to be assured of ample time to cross the track on the basis of vision only. The only warning of oncoming trains was the train whistle, and there was testimony from which the jury could have concluded that the engineer failed to sound the whistle. In affirming a jury verdict for the plaintiff, the court said that at a totally unguard-

---

8. "Although maintaining a crossing with what the jury may have believed to be a dangerously limited view might not have been enough by itself to warrant a finding of negligence, a railroad does have a special duty of care towards those who use such a crossing. "When a railroad company knows that the view of approaching trains at a crossing is restricted to an unduly short distance, it is 'bound to take that fact into consideration and so to regulate the running of its trains as to make it possible for a driver to cross

the tracks in safety if, when just before entering upon them, he stopped, looked and listened, and no train was within sight and sound' [citations omitted]." Although we might not have drawn the same inferences from the evidence as did the jury, we believe that the jury was justified in finding negligence from testimony that the train was traveling at 45 miles per hour, that the engineer never saw Fallon's car, and that the engineer failed to sound the train's horn."

ed crossing with vision so restricted the railroad owes a "special duty of care" to motorists *in the running of its trains.* The evidence of negligence on which the court sustained the verdict was the 45 mile per hour speed at which the train was run and the failure to sound the whistle, two facts that would not ordinarily constitute negligence at a better protected crossing or one with better visibility characteristics. Since the court upheld the verdict on the basis of the manner of operation of the train, the decision simply indicates that the "special duty" is to run trains more carefully where there is no adequate warning to motorists.

For several reasons, we do not regard *Fallon* as calling for a charge on the "special duty" in the case before us. First, the jury verdict in *Fallon* was for the plaintiff, so that the appellate court was examining the evidence in a different light. The jury's verdict apparently followed a charge that the railroad had a duty of reasonable (not "special") care. Secondly, the crossing in *Fallon* was different: it was not protected by flashing lights, and there was evidence that the train whistle was not sounded. Thus, we do not believe that *Fallon* was intended to modify long-settled principles of grade crossing law, and the *Fallon* court gave no indication that it was doing so.

 As the authorities which we have cited indicate, the standard of ordinary care under the circumstances is applicable to both aspects of a railroad's duty to motorists at a grade crossing: maintenance of the crossing and operation of the train.[9] In particular, probably because of the obvious difficulties in stopping and starting of vehicles which are designed to operate at relatively high speeds upon an exclusive right of way so that the purposes of mass transportation may be achieved, a railroad, unlike the driver of an automobile, has no duty to operate its vehicles at such a speed that they can always stop within the assured clear distance ahead, as long as it provides sufficient warning to motorists to keep out of the way. We conclude that the charge was correct[10] and that the evidence was sufficient to support a jury finding of both contributory negligence on the part of decedent and absence of negligence on the part of defendant.

---

9. Although Pennsylvania law does impose upon common carriers a duty of exercising a high degree of care towards passengers, that special duty is not owed to third parties.

10. The discussion in this Opinon also explains the court's refusal to charge in accordance with plaintiff's requests numbered 4, 5, and 6 (relating to the defendant's duty of care) and 16 (which asked for a directed verdict for plaintiff on the issue of contributory negligence).