The VENZIE CORPORATION, and F. M. Venzie & Company, Inc.

v.

UNITED STATES MINERAL PRODUCTS COMPANY, INC., and William Armstrong & Sons, Inc.

Civ. A. No. 71–123.

United States District Court, E. D. Pennsylvania.

July 31, 1974.

Peter Hearn and Murray S. Levin, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiffs.

Morris R. Brooke, Drinke, Biddle & Reath, Philadelphia, Pa., for United States Mineral Products Co., Inc.

Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for William Armstrong & Sons, Inc.

## OPINION

HIGGINBOTHAM, District Judge.

## I.

## INTRODUCTION

The plaintiffs, the Venzie Corporation ("Venzie") and F. M. Venzie Company, Inc. ("FMV"), instituted this antitrust action against the defendants, United States Mineral Products Company, Inc. ("USMP") and William Armstrong & Sons, Inc. ("Armstrong"), for certain purported violations of Sections 1 and 2 of the Sherman Act, as amended, 15 U.S.C. §§ 1[1] and 2.[2] Among the proscribed conduct the Complaint alleged that defendants had (1) conspired to monopolize or attempt to monopolize the relevant product market of asbestos-free spray fireproofing materials in the Philadelphia vicinity; (2) that defendants had employed unlawful tying arrangements; (3) there had been illegal territorial division of markets and the imposition of anti-competitive resale restrictions; and (4) the defendants had engaged in a concerted refusal to deal.

This matter was duly tried to a jury, whereupon at the conclusion of the presentation of the plaintiffs' evidence both defendants moved for directed verdicts in accordance with Fed.R.Civ.P. 50(a).[3] The Court ruled that on the evidence adduced by the plaintiffs they had failed to establish a prima facie case regarding the tying arrangements and the territorial division of markets. The Court determined further that assuming *arguendo* that either defendant unilaterally possessed monopoly power over the asbestos-free spray fireproofing materials the plaintiffs clearly had not demonstrated that there was "the willful acquisition or maintenance of that power as distinguished from growth or de-

1. 15 U.S.C. § 1 provides in relevant part:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . ."

2. 15 U.S.C. § 2 states:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

3. Fed.R.Civ.P. 50 reads in pertinent part:
"(a) Motion for Directed Verdict: When Made; Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent *may offer* evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not made made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. *The order of the court granting a motion for a directed verdict is* effective without any assent of the jury."

velopment as a consequence of a superior product, business acumen, or historic accident" in contravention of United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1968). Moreover, insofar as the plaintiffs were arguing that where USMP or Armstrong separately and without agreement refused to deal with the plaintiffs, the Court additionally held that such unilateral refusals to deal were not *per se* violations of Section 1 of the Sherman Act and defendants were entitled to directed verdicts.

The Court reserved its judgment on the conspiracy issues, namely, whether there was a conspiracy to monopolize, a conspiracy to attempt to monopolize or a conspiracy to refuse to deal. Upon completion of the defendants' evidence, defendants renewed their motions for directed verdicts. In a Memorandum Opinion dictated from the Bench the Court noted that the trial record preponderated in favor of finding as a matter of law that the relevant product market included all structural steel fireproofing materials rather than solely non-asbestos fireproofing spray products and that plaintiffs had not met their burden of proof in establishing that USMP's new product was any significant portion of the total structural fireproofing market. The Court also declared that the plaintiffs had not shown that there was any

anti-competitive motive or effect relative to the defendants' conduct toward the plaintiffs in refusing to deal.

Notwithstanding the Court's rulings, in the interest of judicial economy the Court deemed it feasible to submit the conspiracy and relevant product issues to the jury, since such a procedure would require only an additional two or three days of trial time and could possibly obviate a second trial encompassing maybe five or six weeks should an appellate Court disagree with its rulings. Upon submission of the case to the jury, the jury's answers to specially prepared interrogatories concluded that the relevant product market should be limited to only non-asbestos spray fireproofing products and that the defendants had participated in a concerted refusal to deal with the plaintiffs. The jury however determined that the defendants had not conspired to monopolize or conspired to attempt to monopolize the relevant product market. Trebling the damages awarded the plaintiffs, the verdict was recorded in the amount of $336,402.

The defendants have now moved the Court for judgment n. o. v. pursuant to Fed.R.Civ.P. 50(b) [4] or in the alternative for a new trial, and the plaintiffs have petitioned the Court for the assessment of reasonable counsel fees in the amount of $100,000 in accordance with Section 4 of the Clayton Act, 15 U.S.C. §

---

4. Fed.R.Civ.P. 50 states in relevant part:
   "(b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, with-

in 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

15.[5] For reasons hereinafter appearing, the defendants' motions for judgment n. o. v. are Granted.

## II.

### HISTORY OF THE CASE.

On a motion for directed verdict or judgment n. o. v. the Court is obligated to view the entire record in a light most favorable to the party opposing the motion, extending to the plaintiff the benefit of every inference which can be reasonably drawn from the evidence. The Court is appropriately cautioned that it does not undertake to appraise the weight or the credibility of the evidence presented in the case. See, e. g., Brady v. Southern Ry. Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); Woods v. National Life and Accident Insurance Company, 347 F.2d 760, 768 (3d Cir. 1965); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir. 1963); Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199, 202 (3rd Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); Schad v. Twentieth Century-Fox Film Corp., 136 F.2d 991, 993 (3rd Cir. 1943); Johnson v. J. H. Yost Lumber Co., 117 F.2d 53, 57 (8th Cir. 1941); McGlinchey v. Baker, 356 F.Supp. 1134, 1136 (E.D.Pa.1973), and Paletsky v. Farrell, 54 F.R.D. 467, 469 (M.D.Pa. 1972).

A brief recitation of the pertinent facts will be of aid in analyzing and understanding the case at bar.

Plaintiffs Venzie and FMV and defendant Armstrong are all engaged as applicators in the lathing, plastering and structural fireproofing business. Defendant USMP, on the other hand, is not an applicator but rather manufactures, sells and distributes fireproofing materials, including a non-asbestos fireproofing spray called Cafco Blaze-Shield DC/F, the product which the defendants refused to make available to the plaintiffs and thus precipitated this litigation.

The background events of this case first unfold on October 2, 1969 when the Turner Construction Company ("Turner") awarded FMV the contract to do the structural fireproofing work on the Philadelphia Electric Company building at 2301 Market Street in Philadelphia ("PE"). FMV's selection for the project was based on its tendering the lowest bid of $110,000. Several weeks later Turner awarded a second contract to Venzie for it to perform all the structural fireproofing work on the Fidelity Mutual Girard Trust Building at 15th and South Penn Square in Philadelphia ("FG"). In the Fall of 1969 these two projects probably represented the largest structural fireproofing jobs in the City of Philadelphia and had been competitively sought after by practitioners of the trade. Armstrong, like other companies, had bid on both of these jobs, only to be rejected because it did not submit the lowest bid.

Contemporaneous with these events, several governmental agencies—the Pennsylvania Department of Environmental Resources, Air Management Services of Philadelphia ("AMS"), and the Occupational & Radiological Health Section of Philadelphia—were conducting investigations relative to the health hazards arising out of the utilization of spray fireproofing materials containing asbestos. There was a growing concern among governmental officials that unless asbestos-bearing spray fireproofing products were properly contained, serious ecological and health risks could result.

---

5. 15 U.S.C. § 15 provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Since an asbestos-containing fireproofing material would be used by FMV, the Turner-FMV fireproofing contract for the PE building required FMV to enclose completely all areas to be spray fireproofed with tarpaulins so that asbestos-bearing dust and flakes from the fireproofing spray would not become air-borne beyond the building lines. FMV was furthermore required to clean up all deposits of fireproofing material after each floor of the building was completed. The Turner-Venzie fireproofing contract for the FG building contained similar provisions with respect to enclosures and cleaning; however, special dust control equipment would also be needed to minimize the accumulation of dust on the construction. In addition to the aforementioned contractual terms, the City issued to Venzie and FMV permits for spray fireproofing the FG and PE buildings on the condition that there be 100% containment of the spray fireproofing materials.

Notwithstanding the contractual obligations and the commitments made to the City, the plaintiffs did not adhere to their promises. Numerous citations were issued against FMV and Venzie for violating the City's Air Pollution Code in failing to contain the fireproofing materials within the building confines. The City of Philadelphia instituted an equity action against Venzie and Turner on March 20, 1970 relative to the FG job to compel total containment of the spray fireproofing materials as had been previously agreed upon when the spray permit had been granted by the City. On April 2, 1970 a Stipulation was entered and approved by a Judge of the Common Pleas Court of Philadelphia, committing Turner and Venzie to have complete containment of the spray fireproofing material used at the construction sites. Despite the execution of this Stipulation, Venzie received additional citations on April 30, June 9, 11 and 17, 1970 for its continued failure to contain the spray fireproofing materials.[6]

On June 23, 1970 spraying operations had reached the tenth floor of the FG building. Due to Venzie's continuing failure to contain the asbestos-bearing spray the Philadelphia District Attorney initiated a criminal action against Venzie, resulting in a suspension of the work on the FG project pending resolution of the legal questions. Spraying operations were simultaneously stopped at the PE job as Turner and FMV awaited the outcome of Venzie's legal difficulties with the City.

Even though Venzie had originally submitted a bid to Turner expressly agreeing to a 100% containment of the spray fireproofing material for a lump sum, Venzie was now able to renegotiate the contract with Turner whereby Venzie would be reimbursed for costs and additionally provided a fee of 10% for overhead and 5% profit. A similar alteration was reached between Turner and FMV with 10% being allowed for overhead and profit.

On July 21, 1970, Venzie pleaded *nolo contendere* to the criminal charges brought against it by the District Attorney's Office and paid a fine of $750.00. An Order was entered by the Common Pleas Court Judge permitting Venzie to continue applying an asbestos-bearing fireproofing material on the FG building. The Order however included the following proviso:

> "Immediately upon approval for use in accordance with the standards set forth under the Philadelphia Fire Code of a non-asbestos fireproofing material, such material shall be used for future fireproofing in place of asbestos-bearing material."

On August 28, 1970, upon representation to the Court that Venzie could apply and fully contain an asbestos-bearing materi-

6. Although these enforcement actions were directed primarily against Venzie and the FG project, Turner required FMV to comply with the terms of the consent decree agreed to by Venzie on April 2, 1970. FMV had also received citations for violating the City's Air Pollution Code but there had been no Court proceedings brought against it.

al in accordance with the Order of July 21, 1970, the foregoing proviso was deleted, thus enabling an asbestos spray fireproofing product to be used indefinitely on the FG project. During this period of time two other contractors were able to secure similar Court decrees whereby under conditions calling for complete containment and adequate clean-up procedures, they could complete the fireproofing work utilizing an asbestos-bearing fireproofing spray.

Though there were swift legal ramifications for any fireproofing applicator who undertook to spray an asbestos-containing product without adequate containment, during the relevant period in question there was never any Court Order, local or state regulation banning entirely the use of an asbestos-bearing fireproofing spray if it were properly contained. In fact, in a report prepared by the Philadelphia Department of Health Ad Hoc Committee on Environmental and Occupational Hazards of Spray Asbestos Fibers, dated August 31, 1970, it specifically recommended that the spraying of asbestos material in building construction within the City of Philadelphia should not be prohibited until "three months subsequent to (1) the adoption of the regulation, or (2) at such earlier date on which approved asbestos-free spray fireproofing substitutes are commercially available from at least two manufacturers." Regulations prohibiting the use of asbestos in fireproofing materials did not go into effect until July 18, 1971, but by November 4, 1970 two asbestos-free spray fireproofing substitutes were commercially available.

The Philadelphia Building Code's fire retardation standards required fireproofing products to have attained 4 hour column, 4 hour beam and 3 hour deck ratings from the Underwriters Laboratories, Inc. ("ULI"). In addition, a non-asbestos fireproofing spray product had to be approved by the Department of Licenses and Inspections of the City of Philadelphia ("DLI") and by AMS of the Philadelphia Health Department.

Given that overview, one must also interweave and highlight the salient facts relating to USMP and Armstrong.

In late March of 1970 USMP gained approval from ULI for one of its products recently introduced on the market. Though there were several asbestos-bearing spray fireproofing materials generally available commercially, this product, Cafco Blaze-Shield DC/F ("DC/F"), was the first *non*-asbestos spray fireproofing product to have received ULI approval in the Philadelphia area. DC/F, however, had not at that time been recognized by DLI or AMS.

Since at least February 1965, Armstrong has been a licensed applicator of USMP and was thereby entitled to purchase from USMP an accoustical tile product, Cafco Sound-Shield 85, and its fireproofing products, including Cafco Blaze-Shield, a forerunner of Cafco Blaze-Shield DC/F. The agreements formalizing this arrangement were non-exclusive in their wording. Though geographically the license agreements disclosed that Armstrong would operate in Philadelphia and the surrounding counties, Armstrong was not expressly prevented from bidding on and accepting work outside of this catchment area. Nor did the license agreements explicitly preclude Armstrong from using products of other manufacturers, though implicitly USMP had agreed to fulfill all the fireproofing needs of Armstrong.

It so happened that in the spring and summer of 1970 Armstrong was the only licensed applicator of USMP in the Philadelphia vicinity. Ironically, in the early 1960's USMP had a license agreement with Venzie but USMP terminated this agreement when Venzie misapplied Cafco Blaze-Shield by refusing to apply the material as thickly as USMP thought necessary for adequate fire protection.[7]

---

7. In the early 1960's FMV had not yet been incorporated. Howard Venzie, who later was affiliated with FMV, was one of the Venzie brothers operating the Venzie Corporation as it then existed.

Thus since that time USMP had not sold Venzie any of its fireproofing products, though it has sold Venzie some of its accoustical tile product, Cafco Sound-Shield 85.

Around early July 1970 in the wake of Turner's and Venzie's increasing legal troubles with the City and the technical difficulties [8] encountered in containing 100% an asbestos-bearing spray fireproofing product, and furthermore due to the construction delays attendant to these events, Turner decided that it wanted to complete the FG and PE projects with a non-asbestos spray.

The record in this case is uncontroverted that the first instance anyone associated with the plaintiffs attempted to purchase DC/F from USMP was on July 6, 1970 when Clyde Marshall ("Marshall") of Turner called Harry Gropp ("Gropp"), the Sales Manager for USMP, and sought to buy DC/F for Turner or the plaintiffs. Gropp's response was "No." As reported at the trial:

"Q. Now getting to your conversation, Mr. Marshall, with Mr. Gropp of United States Mineral Products Company on July 6th, did you ask Mr. Gropp specifically whether or not he would sell Cafco DC/F for the Philadelphia Electric job to be applied by F. M. Venzie & Company?

"A. You are going back three years. I asked him—I told him that we had two jobs that needed non-asbestos material. I asked him would he sell it to the subcontractors that were working on these jobs or to Turner.

"Q. And what did he answer?

"A. No.

"Q. He said right then and there that he would not sell it?

"A. To my recollection, that was his answer."

During the same telephone conversation of July 6th Group however referred Marshall to Harry Schneider ("Schneider"),[9] who was affiliated with USMP. Marshall was further advised that USMP had a franchised applicator in Philadelphia. In a letter dated the same day, Gropp wrote to Marshall, discussing DC/F and again directing him to Schneider. When Marshall called Schneider on August 4th, he was told that USMP had a franchised applicator in Philadelphia and that Marshall should contact them.

On July 17, 1970 Howard Venzie ("Howard") of FMV, who had seen DC/F advertised in the June 1970 issue of *Walls and Ceilings*, called Schneider of USMP to purchase DC/F. Howard told Schneider about Turner's decision to complete the PE building with a non-asbestos fireproofing spray. Schneider suggested that Howard contact Armstrong, stating "I am sure they [Armstrong] can work something out for you or make it available." Howard was not expressly told "No" but at least the implication was clear that USMP would not sell him the product. Howard in the past had purchased from USMP Cafco Sound-Shield 85, the accoustical tile product, even though he was not a licensee of USMP.

On July 18th Howard called William Armstrong, III, the president of Arm-

8. The asbestos-bearing emissions into the air could have been more efficiently contained if the exterior walls of the building had been first erected, but Turner decided it did not want to follow that approach and consequently relied primarily upon the use of tarpaulins.

9. Schneider was the Regional Sales Representative for USMP and operated not out of Philadelphia but in Maryland.
The plaintiffs contend that Gropp's response was not in fact a firm "No" and that maybe the necessary approval to sell DC/F must come from Schneider. Furthermore, Gropp apparently did not specifically bottom his refusal to sell on Turner's or the plaintiffs' not being licensed applicators of USMP.

strong, who told Howard "our franchise forbids us to sell the product." Approximately around this time Howard also spoke to William D'Arcy of Armstrong about the possibility of obtaining DC/F for the PE project and was apprised that Howard would have to talk to John D'Arcy, Sr. ("D'Arcy, Sr."), Chairman of the Board of Armstrong.

On July 19th, Howard telephoned John D'Arcy, Sr., to follow up on his request of buying DC/F for the PE job. The testimony of Howard was that D'Arcy, Sr. "informed me that he cannot sell the material. He said 'terminate your contract,' and he will finish it [the PE job] with the right product." At other portions of his testimony Howard stated:

"Mr. D'Arcy, Sr. said he had a franchise with United States Mineral Products and he could not sell the product to me, that if I could not supply material on the job to terminate my contract and he would finish the project."

Howard again called Schneider of USMP on July 20th or July 21st, inquiring if he could purchase DC/F from JAM Industries, USMP's licensed applicator in Trenton, New Jersey. Schneider told him that USMP would discontinue delivering DC/F to JAM Industries if USMP ascertained DC/F was not actually being used by JAM Industries for its own projects. Sometime the same day of July 20th John Hanft of Turner called James P. Verhalen ("Verhalen"), President of USMP, about acquiring DC/F. According to an office memorandum prepared by Hanft the next day summarizing that conversation, it stated in pertinent part:

"After his explaining the importance of seeing their products applied properly so as not to damage their reputation, thus requiring a franchised (i. e., approved) applicator, he agreed that they should endeavor to help us on our two Philadelphia projects which are in difficulty. While he understood that his sales manager (Harry Gropp), who is away for a week, had initiated such action, he reassured me that he would personally exert pressure through his normal channels to have Armstrong make some sort of arrangement with Venzie." [10]

Although the exact day could not be pinpointed, "around the middle of July, or July 22, somewhere in that neighborhood," Wes Brown of Turner called John D'Arcy, Jr. ("D'Arcy, Jr.") of Armstrong and asked if Turner could buy DC/F from Armstrong and turn it over to FMV for use on the PE building. D'Arcy, Jr. said he could not sell to Turner because Turner was not an applicator. Evidently during this conversation, Brown asked if Armstrong would be interested in completing the PE fireproofing job. D'Arcy, Jr.'s response was that he would not be interested since there was another fireproofer on the job.

In addition to the other telephone conversations heretofore noted as having occurred on July 20th, on the same day D'Arcy, Sr. called Schneider. Though there are slightly conflicting versions as to the complete substance of that conversation, it is agreed that D'Arcy, Sr. ap-

---

10. The plaintiffs contend that the Hanft conversation demonstrates the conspiratorial conduct of USMP and urges:

"It was open to the jury to draw several reasonable inferences from the above-quoted language. For one thing, it seems clear that USMP could not act on its own to sell DC/F to the plaintiffs. If it could, that would seem a simpler, more attractive alternative than exerting pressure on Armstrong. Just as Armstrong could not sell DC/F because its franchise agreement with USMP forbade it, so it seems USMP was not free to act on its own. That Verhalen was going to exert pressure on Armstrong leads to a second permissible inference: that the approval of both defendants was necessary before the plaintiffs would be permitted to purchase DC/F from either." (Plaintiffs' Memorandum in Opposition to Defendants' Motion For Judgment N.O.V. and/or For A New Trial at 6–7.)

prised Schneider that Turner had approached him relative to submitting a proposal to complete the PE project and that he, D'Arcy, Sr., had indicated he was not interested. Schneider also reported to D'Arcy, Sr. that he [Schneider] had received two calls from Gropp and Hanft regarding the PE project. The divergence comes in that D'Arcy, Sr. stated that the reason for his call to Schneider was not primarily to discuss the PE project but rather to ask him to come to West Chester, Pennsylvania and review problems relating to use of DC/F on the West Chester State Teachers job, the first job on which Armstrong had applied DC/F.

On July 21st after a visit to the West Chester State Teachers College site, Schneider had lunch at the Conestoga Inn in Bryn Mawr, Pennsylvania with D'Arcy, Sr., Don Hitner and either William D'Arcy or D'Arcy, Jr.[11] The only direct testimony in the case was that at this luncheon the West Chester job was discussed. Plaintiffs however argue that the true purpose of the luncheon and the reasonable inference which the jury can draw from the record was that "this luncheon was when D'Arcy, Sr., D'Arcy, Jr., and Schneider *reconfirmed* their companies' agreement not to make DC/F available to plaintiffs. Their actions over the next month carried out

the agreement—and with the planned for results." (Emphasis added). (Plaintiffs' Memorandum in Opposition to Defendants' Motion For Judgment N.O.V. and/or For A New Trial at 9).[12] Hanft of Turner also called D'Arcy, Sr. on July 21st, during which D'Arcy, Sr. "insisted that the only way that we [Turner] could use Cafco was to have him take over the work on a T & M [time and material] basis."

For the next week communications among the parties were not as frequent. On July 28th Brown of Turner called D'Arcy, Jr., requesting a proposal from Armstrong on the PE job. D'Arcy, Jr. indicated he would have to think it over and call him back. On the same day Armstrong called USMP. The next day, July 29th, Brown called Gropp of USMP to buy DC/F to furnish to Turner's subcontractors. Gropp said USMP could not sell because Turner was not a spray fireproofing applicator and USMP sold only to approved applicators. Gropp suggested that Brown contact their approved applicator, Armstrong.

On July 30th there was another call from Armstrong to USMP. The same day D'Arcy, Jr. called Brown, giving him a proposal for the PE job and saying that he could start in 5 days and he had enough DC/F to finish the PE job.[13]

11. The plaintiffs attach considerable significance to whether William D'Arcy or D'Arcy, Jr. was in attendance at that luncheon. When the PE and FG projects were taken over by Armstrong in *late Augsut 1970*, D'Arcy, Jr. was in charge. Moreover, D'Arcy, Jr. had no connection with the work being undertaken at the West Chester project. Therefore plaintiffs assert it was proper for the jury to infer that D'Arcy, Jr.'s status in August 1970 could be imputed to him on July 21, 1970, despite the fact that on July 21st the PE and FG projects were not Armstrong's.

12. Even at this stage of the case, the Court is still unable to fathom when the initial agreement between Armstrong and USMP was actually formulated.

13. Plaintiffs again offer an explanation for this series of events:

"On July 28, Brown asked D'Arcy, Jr. whether Armstrong would submit a proposal to complete the PE building. D'Arcy, Jr. called back on July 30 with the full details of a proposal. More significantly, D'Arcy, Jr. said Armstrong could begin in five days and had enough DC/F to complete the PE job (N.T. 147), one of the largest fireproofing jobs in Philadelphia history. This information could have been obtained only from USMP in either or both of the telephone calls which occurred on July 28 and July 30 (Venzie Exh. 8). Armstrong didn't have a significant amount of DC/F in its possession (N.T. 887). All of the DC/F it would use would have to come from

On July 31st D'Arcy, Jr. called Schneider, asking him to come to Philadelphia the next business day to assist in getting DC/F approved by the City of Philadelphia. On August 3rd and 4th Schneider was in Philadelphia, and, together with D'Arcy, Jr., visited the various City offices in an effort to expedite the clearance of DC/F. In addition on August 4th Marshall of Turner called Schneider and was told that USMP had a franchised applicator to whom USMP would sell and that Marshall should contact Armstrong.

On August 17th DC/F was approved by the Philadelphia Department of Licenses and Inspections and on August 26th DC/F was approved by the Philadelphia Health Department—AMS. FMV was formally terminated from the PE job on August 28, 1970 and Venzie was released from the FG job on August 31, 1970. In each instance the basis for the termination was the inability of plaintiffs to obtain DC/F. Both FMV and Venzie were replaced by Armstrong.[14]

Finally, on November 4, 1970 the City of Philadelphia approved a new product by W. R. Grace & Co. called Monokote MK–4. This product, a non-asbestos fireproofing spray, then became the second product apart from DC/F to have met all the necessary clearances by the City of Philadelphia.

One other fact should be mentioned. Before Monokote MK–4 was approved by the City, Whitman Brothers, Inc. ("Whitman") and T. J. McGlone & Co., Inc. ("McGlone"), contractors and non-licensees of USMP, sought to purchase DC/F from USMP for use on their projects. After being refused, Whitman and McGlone threatened to sue USMP in order to obtain DC/F. Verhalen, the President of USMP, acquiesced and, over the objections of Schneider, agreed to sell them DC/F. This series of events occurred during September and October 1970, thus after both of the plaintiffs' contracts had already been terminated.

Thus the jury here was presented a case where, among other things, the record established that (1) USMP would not sell the product, DC/F, to the plaintiffs but referred them instead to Armstrong; (2) Armstrong, too, refused to sell DC/F to plaintiffs because it believed its franchise by USMP prevented it; and (3) when faced with a lawsuit USMP sold DC/F to non-licensed applicators.

The plaintiffs herein urge that the reasonable inferences to be drawn from this record are that USMP and Arm-

---

USMP. On these facts it was perfectly proper for the jury to infer that D'Arcy, Jr. and USMP discussed the PE proposal, that they agreed to go after the job aggressively by telling Brown that work could begin in five days and that DC/F was fully available. All of the visits to Philadelphia by Schneider, luncheons, telephone calls between Armstrong and USMP, joint visits to City officials, Turner, the architect, etc. must be viewed in light of this aggressive interest in the jobs.

"It should also be noted that D'Arcy, Sr. and D'Arcy, Jr. explain all but two of the numerous telephone calls between USMP and Armstrong during the relevant time period as having to do with the 'relatively small' West Chester job (N.T. 822, 823, 836ff, and 910ff). The jury, as it was free to do, obviously did not believe the Armstrong testimony that 'such calls were readily . . . explained . . . as per-

taining to other matters, i.e., the West Chester job.' (Armstrong Memorandum p. 14.). The jury may properly have wondered: why so much concern over West Chester and so little concern over PE, one of the largest spray fireproofing jobs in the history of Philadelphia? Equally properly, the jury may have inferred that these calls dealt primarily with PE and FG jobs." (Plaintiffs' Memorandum in Opposition to Defendants' Motion For Judgment N.O.V. and/or For A New Trial at 9–10.)

14. Armstrong assumed both of these jobs on more favorable terms than had been extended to Venzie or FMV. Armstrong would receive costs plus 15% for overhead and 10% profit. As previously noted, FMV's revised contract with Turner provided for costs plus 10% for combined overhead and profit. Turner's contract with Venzie allowed for costs plus 10% overhead and 5% profit.

strong agreed to carve out the Philadelphia vicinity as Armstrong's "exclusive" territory; that USMP *could* not sell any of its fireproofing products, particularly DC/F, to any other applicator or party without first consulting with Armstrong; that Armstrong *could* not sell DC/F unless it first cleared it with USMP; that USMP would aggressively seek out fireproofing business and channel it to Armstrong; that the defendants were not unilaterally implementing a long-standing policy of any type; and finally that these acts were undertaken solely to deprive the plaintiffs of their contracts so that Armstrong might be substituted.

The plaintiffs maintain these inferences are reasonable notwithstanding that Armstrong has been in the fireproofing business as an applicator for 75 years and has never been engaged as a retailer or distributor of fireproofing products; that there was no economic advantage whatsoever to USMP's selling to Armstrong in lieu of Venzie or FMV or Turner; that USMP had had unfavorable business experiences with Venzie in the past, culminating in the termination of Venzie's license; that USMP at this time sold its fireproofing products only to licensed applicators; that neither Armstrong nor USMP in any way caused plaintiffs' legal complications with the City of Philadelphia; and that if USMP had the only available product it was purely a historic accident and due to its technological expertise.

Construing the facts most favorably towards the plaintiffs, the Court must conclude that the record when viewed in its entirety does not reasonably support the inferences which the plaintiffs now advance.

### III.

### DISCUSSION

■■ One of the troublesome issues emerging from the facts of this case was superbly and succinctly articulated by the United States Supreme Court in Theatre Enterprises v. Paramount Film D. Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954), where it remarked that "[t]he crucial question is whether [defendants'] conduct toward [plaintiffs] stemmed from independent decision or from an agreement, tacit or express." Now that this Court has once again had the opportunity to review thoroughly the instant record, it is still firmly convinced that the impetus of defendants' conduct was predicated upon each of them acting unilaterally, separately, and not in concert. Each defendant was actuated by independent grounds although the decision-making process may have manifested itself by a similarity of behavior. Moreover, even if the Court concluded there were some concerted activity by the defendants the facts, as are borne out by this record, clearly do not demonstrate that either the purpose or the *effect* of the conduct was so pernicious and anti-competitive that there consequently arose an unreasonable restraint of trade which should thereby saddle the defendants with treble damages under the antitrust laws. *Cf.* Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3rd Cir. 1962), and Gamco, Inc. v. Providence Fruit & Produce Bldg., 194 F.2d 484 (1st Cir. 1952).

■■ The Court in reaching this judgment is not unmindful that where there are allegations of conspiratorial elements or clandestine agreements, the plaintiffs necessarily might rely heavily on circumstantial or indirect evidence to prove and buttress their case. Theatre Enterprises v. Paramount Film D. Corp., *supra*, 346 U.S. at 540–541, 74 S.Ct. at 259–260. Resorting to circumstantial evidence nonetheless does not wholly relieve the plaintiffs of their obligation of coming forward with substantial evi-

dence establishing the formation or nature of an unlawful agreement rather than resting on mere suspicion or conjecture. Johnson v. J. H. Yost Lumber Co., *supra*, 117 F.2d at 61. *Cf.* Schad v. Twentieth Century-Fox Film Corp., *supra*, 136 F.2d at 996. Parallel business behavior in and of itself or a similar pattern of conduct does not automatically compel, or conclusively warrant, a finding of a conspiracy or concerted action or other liability under the Sherman Act. Winchester Theatre Co. v. Paramount Film Distributing Corp., 324 F.2d 652, 653 (1st Cir. 1963); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661–665 (9th Cir. 1963); Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61, 64 (3rd Cir. 1962); Delaware Valley Marine Sup. Co. v. American Tobacco Co., 297 F.2d 199, 202–206 (3rd Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); North Penn Oil & Tire Co. v. Phillips Petroleum Co., 358 F.Supp. 908, 922–923 (E.D. Pa.1973); United Shoppers Exclusive v. Broadway-Hale Stores, Inc., 1966 CCH Trade Cas. ¶ 71,727 at 82,271 to 82,272 (N.D.Cal.1965), and United States v. Twentieth Century-Fox Film Corp., 137 F.Supp. 78, 85 (S.D.Cal.1956).

■ In United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), the Supreme Court sought to harmonize the provisions of the Sherman Act invalidating all restraints of trade with the right of a merchant unilaterally to engage in business with whom he desires. "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *Id.* at 307, 39 S.Ct. at 468. Conversely, group boycotts or concerted refusals to deal create a *per se* liability under the antitrust laws because the restraints intrinsically are so unduly restrictive and anti-competitive. See, *e. g.*, Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 659–660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211–212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); Otto Milk Co. v. United Dairy Farmers Coop Ass'n., 388 F.2d 789, 797 (3rd Cir. 1967), and Jones Knitting Corp. v. Morgan, 361 F.2d 451, 459 (3rd Cir. 1966).

The Supreme Court has observed however in White Motor Co. v. United States, 372 U.S. 253, 261–264, 83 S.Ct. 696, 701–702, 9 L.Ed.2d 738 (1963), that not every *vertical* arrangement between a manufacturer and a distributor resulted in establishing *per se* liability, and that the standard of the "rule of reason" should be applied. An examination of the business practices and the restraint of trade inherent therein must be fully explored in weighing and assessing the anti-competitive impact of the particular arrangement. An exclusive distributorship is an illustration of a vertical restraint of trade which has received widespread judicial sanction. Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery, 454 F.2d 442, 452–453 (9th Cir. 1972); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–80 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286–287 (6th Cir. 1963); Packard Motor Car Co. v. Webster Motor Car Co. 100 U.S.App.D.C. 161, 243 F.2d 418, 420–421 (1957), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), and Peerless Dental Supply Co. v. Weber Dental Mfg. Co., 283 F.Supp. 288, 289–290 (E.D.Pa.1968). In *Seagram & Sons Inc., supra,* the Court expressly found that absent the existence of an anti-competitive purpose and/or effect, "the decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed

before the seller terminates his dealings with A." 416 F.2d at 78.

The Court acknowledges that the case at bar does not involve an exclusive dealership although at all times relevant hereto USMP had only a single franchised applicator, Armstrong, in the Philadelphia vicinity. But other non-exclusive dealership settings have gained judicial approval even though the vertical relationships produced some measurable restriction in competition. Weather Wise Co. v. Aeroquip Corp., 468 F.2d 716, 718 (5th Cir. 1972), cert. denied, 410 U.S. 990, 93 S.Ct. 1505, 36 L.Ed.2d 188 (1973); Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094 (3rd Cir. 1972); Bushie v. Stenocord Corp., 460 F.2d 116, 119–120 (9th Cir. 1972); Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F.2d 138, 144–148 (6th Cir. 1972), and Tripoli Co. v. Wella Corp., 425 F.2d 932, 936–939 (3rd Cir. 1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Plaintiffs strenuously maintain that in many of the cases heretofore cited, there had been explicit findings that there were other products reasonably interchangeable or the plaintiffs had failed to show that there were no such alternatives available. Considerable emphasis is placed on language in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967), where the Court stated:

"At the other extreme, a manufacturer of a product *other and equivalent brands of which are readily available in the market* may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the re-

striction on these facts alone, would not violate the Sherman Act." (Emphasis added.)

The ultimate and pivotal question presented in this case can therefore be distilled as follows: *Absent an anti-competitive objective,* does a manufacturer forfeit the right to select his customers if arguably his product is the only one available? That statement of the issue necessarily assumes that in the case at bar there in fact was only one product, Cafco DC/F, though that assumption was, and still is, vigorously challenged. The above framing of the issue assumes furthermore that this record does not evidence any unlawful, anti-competitive motive of the defendants.

A subsidiary issue in this case is whether the delineation of the relevant product market is a factual determination—falling entirely within the province of the jury—or a legal judgment—which is defined by the Court. Many of the leading antitrust cases have been non-jury and therefore are not totally dispositive of this point. *E. g.,* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In the non-jury case of Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237, 1245 (8th Cir. 1973) the Court declared that the definition of the relevant product market was essentially a fact question subject to the application of certain legal guidelines.

*DuPont* teaches us that the touchstone for ascertaining the relevant product market in a Section 2 context is "reasonable interchangeability" of products. Factors which should be considered are the cross-elasticity of demand, the similarity of price, the adaptability of products, the uses to which the product is put, and its general characteristics. 351 U.S. at 380–381, 394–404, 76 S.Ct. at 999, 1006–1012. In *Brown*

*Shoe,* where the Court was explicating the parameters of Section 7 of the Clayton Act, it recognized that the relevant product market could consist of a submarket for antitrust purposes.

"The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1524.

The Court in *Grinnell* likewise found that in a Section 2 matrix there could exist submarkets, but it noted further that it would be permissible to combine "in a single market a number of different products or services where that combination reflects commercial realities." 384 U.S. at 572, 86 S.Ct. at 1704.

Throughout the trial of the instant case, the defendants adopted the position that the relevant product market should include all structural steel fireproofing materials and combination of materials instead of being limited solely to non-asbestos fireproofing spray materials. The Court is in agreement with that contention.

First, it is clear that plaintiff could have utilized an asbestos-bearing, direct-to-steel fireproofing spray had there been 100% containment of the air-borne emissions. Except for the presence of asbestos, those products are reasonably interchangeable with Cafco DC/F.

Secondly, there were generally available on the market a number of non-asbestos cementitious and membrane products which could have been used for structural steel fireproofing. These products performed essentially the identical function and the cost per square foot of fireproofing one inch thick was approximately the same, although the application costs may have been three and four times as expensive as a non-asbestos fireproofing spray or an asbestos containing fireproofing spray. *Cf. DuPont,* 351 U.S. at 405–413, 76 S.Ct. at 1012–1016. Some of those products are listed in the following chart:

| Product | Column Rating | Beam Rating | Deck Rating | Method of Application | Cost per Sq. Ft. x 1″ thick | Result |
|---|---|---|---|---|---|---|
| Nat'l Gypsum Co. Gypsolite (Types G, G–2, and G–3). | 4 hr. | 4 hr. | 3 hr. | sprayed to metal lath or board | .12 | Partially finished structural member |
| U. S. Gypsum Co. Structolite (Types R and S) | 4 hr. | 4 hr. | 3 hr. | ″ | .12 | ″ |
| Gypsum board or tile (various manufacturers) | 4 hr. | 4 hr. | 3 hr. | ″ | .12 | ″ |
| Fiber board (various manufacturers) | 4 hr. | 4 hr. | | ″ | .08–.09 | ″ |
| Vermiculite or perlite plaster (various mfrs.) | 4 hr. | 4 hr. | 3 hr. | applied to metal lath | .08–.10 | ″ |
| Johns-Manville Blaze-Crete | 4 hr. | | | ″ | .12 | ″ |

. During the relevant period in question there were no other non-asbestos fire-proofing spray products that had received *both* ULI and AMS approval except for Cafco DC/F.

The following interrogatories were submitted to the jury for their determination of the relevant product market:

"(1) DO YOU FIND THAT THE RELEVANT PRODUCT MARKET WAS <u>NON</u>-ASBESTOS SPRAY (DIRECT TO STEEL) PR<u>ODU</u>CTS?     YES_____

NO_____

"(2) DO YOU FIND THAT THE RELEVANT PRODUCT MARKET WAS ASBESTOS <u>AND</u> NON–ASBESTOS SPRAY (DIRECT TO STEE<u>L</u>) PRODUCTS?     YES_____

NO_____

"(3) DO YOU FIND THAT THE RELEVANT PRODUCT MARKET WAS <u>ALL</u> STRUCTURAL STEEL FIRE PROO<u>FIN</u>G PRODUCTS (INCLUDING SPRAY AND NON-SPRAY, ASBESTOS AND NON-ASBESTOS, GYPSUM BOARD, TILE, METAL LATHE AND PLASTER, ETC.)?"     YES_____

NO_____

---

The jury answered "Yes" to interrogatory (1).

■ The Court believes—irrespective of whether it should be a factual or legal determination—that given the record in this case the relevant product market should have encompassed all structural steel fireproofing products if the standards of *DuPont, Brown Shoe,* and *Grinnell* are followed. All the reasonable inferences inescapably point to such a conclusion.

Courts generally have cast serious doubts on the existence of a relevant product market which is comprised of only a single product. *DuPont, supra,* 351 U.S. at 380–381, 394–404, 76 S.Ct. at 999, 1006–1012; Acme Precision Products, Inc. v. American Alloys Corp., *supra,* 484 F.2d at 1242–1244; Bendix Corp. v. Balax, Inc., 471 F.2d 149, 161 (7th Cir. 1972); Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., *supra,* 459 F.2d at 149; Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1344 (9th Cir. 1971); H. E. Fletcher Co. v. Rock of Ages, Corp., 326 F.2d 13, 15, 17 (2d Cir. 1963), and Paddington Corp. v. Major Brands, Inc., 359 F.Supp. 1244, 1249 n. 5 (W.D.Okl.

1973). *Cf.* Bushie v. Stenocord Corp., *supra,* 460 F.2d at 121.

■ Where a refusal to deal as here is unaccompanied by an anti-competitive objective such as price-fixing, territorial division of markets, an attempt at monopolization or group boycotts, a small merchant should be able freely to engage in a private enterprise as he sees fit and proper. USMP is not a public utility or a large conglomerate. If USMP occupied the position of a monopolist it was "thrust" into that position solely because of its ingenuity, industriousness and historic accident. For USMP's fortuitous development of a superior product, a manufacturer should not be rewarded with an antitrust suit when it thereby failed to abandon and disavow its past long-standing business procedure of selling through licensed applicators. Weather Wise Co. v. Aeroquip Corp., *supra,* 468 F.2d at 718; Ark Dental Supply Co. v. Cavitron Corp., *supra,* 461 F. 2d at 1094; Tripoli Co. v. Wella Corp., *supra,* 425 F.2d at 936–939, and United Shoppers Exclusive v. Broadway-Hale Stores, Inc., *supra,* 1966 CCH Trade Cas. ¶ 71,727 at 82,273 and 82,275.

While Armstrong gained financially by Turner's decision to complete the fireproofing work on the PE and FG projects with a non-asbestos fireproofing spray, Armstrong in no manner sought to influence Turner's arriving at that decision. Armstrong, like Venzie and FMV, was an applicator of fireproofing products and was not a distributor. It would indeed be an anomalous result of the antitrust laws to require a non-wholesaler or non-retailer drastically to alter its established business policies and operations by compelling it to become a distributor and then require it to sell those products to competitors when for 75 years it has not been engaged as a retailer or distributor. See cases cited in preceding paragraph.

The Court's review of the instant record and the applicable legal authorities impels it to conclude that the reasonable inferences which the jury could draw are that there was no concerted refusal to deal and that the relevant product market was all structural steel fireproofing products. Furthermore, if defendants did act in concert they were not motivated by the accomplishment of an anti-competitive objective nor was there any unreasonable restraint of trade. Accordingly, in the Court's view, the plaintiffs' verdict must be set aside and the defendants are entitled to judgment n. o. v.

IV.

ALTERNATIVE RULINGS

An appellate Court might conclude that my reading and construction of the record were too myopic and that the record did substantiate the jury findings. Therefore, the Court is additionally ruling on the remaining objections of the defendants. If a reviewing Court determines that the record supports plaintiffs' inferences and that there was a concerted refusal to deal by the defendants to which *per se* liability attached or the restraint of trade caused thereby was so unreasonable because there was only a single product, this Court would then find that defendants' remaining objections are without merit. There would be no need for a second trial and the Court of Appeals could reinstate plaintiffs' verdict.

One of the USMP's reasons as to why it deems there should be a new trial is that there should have been a fourth interrogatory submitted to the jury in their ascertaining the relevant product market. On page 954 of this Opinion, *supra*, the Court includes the three interrogatories which were given to the jury. USMP urges that a fourth interrogatory should have been tendered and that one would have been "all non-asbestos structural fireproofing products, whether direct-to-steel spray, cementitious or membrane." Such a request was made to the Court by both defendants prior to the Court's final drafting of the interrogatories. The Court rejected the request during trial and still believes the three interrogatories given to the jury were adequate. The relevant product market issue was dwelled on at great length by all the parties in this case and thoroughly covered in the Charge of the Court. The jury was fully apprised of the technical and financial differences of all the fireproofing products. It was the jury's belief that only non-asbestos spray direct-to-steel products should constitute the relevant market.

A related objection propounded by USMP is that the jury did not determine whether Spraydon Type II–D or J and Airotherm 400 were available as competing products. These two products were non-asbestos, direct-to-steel fireproofing sprays generally available during the summer of 1970, but neither had attained a 4 hour column rating by

ULI. It thus would have been necessary to have used a combination of other products in order to fireproof the columns of the respective buildings. The jury therefore would have had to have answered "Yes" to interrogatory (3) before either Spraydon II–D or J and Airotherm 400 could have been considered as competing alternatives.

Another objection of the defendants is that there was no finding by the jury that the conduct of the defendants was unreasonable and that such a finding was necessary. If there is *per se* liability because of the concerted refusal to deal, the reasonableness of the defendants' activities is irrelevant. Lamb Enterprises, Inc., v. Toledo Blade Co., 461 F.2d 506, 517 (6th Cir. 1972), cert. denied, 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972).

The final objection is that there was insufficient evidence presented by the plaintiffs regarding the extent of damages sustained by them. Armstrong challenges the use of four estimates offered by plaintiffs' expert relative to computing a portion of plaintiffs' damages. An analysis of the entire record leads the Court to the conclusion that there was adequate evidence upon which the jury could base its verdict without indulging in speculation or conjecture. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123–125, 89 S.Ct. 1562, 1576–1577, 23 L.Ed. 2d 129 (1969); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 262–266, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946), and Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378–379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927).

In these alternative rulings, the Court reserves making any judgment as to the amount of attorneys' fees. If the verdict should be reinstated, this Court will then award plaintiffs' counsel reasonable compensation pursuant to Section 4 of the Clayton Act.